LOUISA GORDON et al., as Administrators of the Estate of JOSEPH GORDON, JR., Deceased, Appellants, *v.* EUGENE L. ASHLEY, Respondent.

1. NEGLIGENCE — ACTION FOR DEATH CAUSED BY FALL OF ELECTRIC LIGHT WIRE — THE FACTS EXAMINED AND HELD THAT THE CASE SHOULD HAVE BEEN SUBMITTED TO THE JURY. The evidence, in an action brought to recover for the death of a decedent caused by a shock of electricity from an electric light wire which broke and fell upon him, examined and *held,* that the evidence bearing upon the negligent erection and maintenance of the electric light wire and the freedom of the decedent from contributory negligence was such that the case should have been submitted to the jury upon these questions.

2. EVIDENCE — WHEN CREDIBILITY OF A WITNESS PRESENTS QUES-
TION OF FACT FOR THE JURY.  While the testimony of a single witness,
if believed, is sufficient to establish any fact in a civil action, still it need
not be believed if the witness is interested, or his statements, even if
uncontradicted, are inconsistent with his own conduct, or so improbable
as to require explanation.  If a fair argument can be made against the
probability of his story, his credibility presents a question for the jury.
Even if they do not think that he intended to speak falsely, still they may
reject his testimony if they are satisfied that he was mistaken owing to
interest, bias, a defective memory or any other reason springing from the
evidence.

3. EVIDENCE — CREDIBILITY OF DEFENDANT SWORN AS WITNESS —
FACTS EXAMINED AND HELD THAT THE EVIDENCE PRESENTS A QUESTION
OF FACT AS TO THE CREDIBILITY OF THE WITNESS.  Where, upon the trial
of an action brought to recover for the death of plaintiffs' intestate, caused
by the fall of an electric light wire, the plaintiffs established a *prima
facie* case, which cast the burden of establishing some defense upon the
defendant, who tried to prove that he did not own the fatal wire at the
time of the accident, but that the electric light system to which it belonged
had been transferred before that time to a corporation of which the defend-
ant, his wife and another, were the incorporators, trustees and the only
stockholders, and that this transfer was made by an assignment in writ-
ing, which had been destroyed by fire, although a second assignment made
two months after the accident, and usually kept in the same place, was
not destroyed, and it appears from the record that substantially all the
evidence to establish the essential fact was given by the defendant him-
self, an interested witness; that his memory was exceedingly imperfect
as to important details; and, that his testimony upon the vital point was
not only not corroborated by other witnesses, or the facts and circum-
stances of the case, but, on the contrary the probability of his story was
lessened thereby, it must be held that the evidence presents a question of
fact as to the credibility of the defendant, and that, therefore, the order
of the Appellate Division affirming the judgment of nonsuit granted by
the trial court must be reversed.

*Gordon* v. *Ashley*, 114 App. Div. 908, reversed.

(Argued January 21, 1908; decided February 18, 1908.)

APPEAL from a judgment of the Appellate Division of the
Supreme Court in the third judicial department, entered
July 9, 1906, affirming a judgment in favor of defendant
entered upon a dismissal of the complaint by the court at a
Trial Term.

This action was brought to recover damages from the
defendant for maintaining an electric wire for lighting pur-

poses so negligently as to cause the death of the plaintiffs' intestate. A general denial and contributory negligence were the defenses set forth in the answer.

Upon the first trial trial the plaintiffs had a verdict, but the Appellate Division reversed the judgment entered thereon and granted a new trial. (34 Misc. Rep. 743; 77 App. Div. 525.) The plaintiffs also had a verdict upon the second trial, but the justice presiding set it aside as against the evidence and contrary to law. On the third trial there was a nonsuit, and the judgment entered accordingly having been affirmed by the Appellate Division, one of the justices dissenting, the plaintiffs appealed to this court.

The facts, so far as material, are stated in the opinion.

*Lewis E. Carr, J. A. Kellogg* and *Edgar Hull* for appellants. It was error for the trial court to hold, as matter of law, that defendant was not responsible for the death of Gordon, resulting, as it did, from a defect in the construction and use of the electric light wire that parted and fell upon him. The evidence on that feature of the case was of such a character that different inferences might well be drawn from it by different minds. Those inferences could not be drawn by the court, but were exclusively in the province of the jury. (*Elwood* v. *W. U. Tel. Co.*, 45 N. Y. 549; *Volkmar* v. *M. R. Co.*, 134 N. Y. 418; *Gilmore* v. *B. H. R. R. Co.*, 6 App. Div. 117; *Matter of Huss*, 126 N. Y. 537; *City of Cohoes* v. *D. & H. C. Co.*, 134 N. Y. 397; *Swords* v. *Edgar*, 59 N. Y. 28.)

*Edgar T. Brackett* for respondent. The evidence of the defendant and West as to the ownership of the plant could not be disregarded. (*Johnson* v. *N. Y. C. & H. R. R. R. Co.*, 173 N. Y. 79; *Hull* v. *Littauer*, 162 N. Y. 569.)

VANN, J. The primary question in this case is who owned and maintained the electric wire that caused the death of the plaintiffs' intestate? The leading facts, as the jury might

have found them, are as follows: On the 3d of February, 1898, the defendant entered into a written contract with the village of Whitehall whereby he agreed to erect a plant and light its streets and public buildings with electricity for the term of five years from the first of May following. The village gave him a franchise during the existence of the contract "to erect and maintain poles, string wires and to furnish electric lights and electric appliances for lighting and power in all the streets," etc. All wires strung or used for the purpose were to be "properly insulated, so as to afford the best and safest protection to life and property." The defendant agreed to save the village harmless from all actions and damages caused by the negligence of himself or his agents and to furnish a bond for the faithful performance of the entire contract. There was also a covenant, substantially in the form required by the statute prohibiting the assignment and subletting of public contracts, "that the right and franchise of and for said electric lighting and any and all rights conferred by this contract are not to be sublet, sold or assigned," by the defendant "without the consent of the board of trustees * * * indicated by a resolution," etc. (L. 1897, ch. 444, sec. 1.)

Pursuant to this contract and prior to April 30, 1898, the defendant leased a power house, placed the requisite machinery therein, installed an electric line through the streets of the village and on that day began to furnish electric service. One of the wires was strung across the Champlain canal and a public highway on the bank thereof, upon poles 160 feet apart. It was not properly stayed so as to prevent vibration and contact with one of the guy wires of a telephone plant. The friction between the two wires when the wind blew had impaired the insulation and weakened the electric wire. The defect in the insulation was increased by dampness. The plaintiffs' intestate was a locktender, and while on duty in a public place during the night of October 1½th, 1898, when the wind was blowing and there was some rain, the wire parted and fell upon him, causing instant death. The wire was of

ordinary size, while the span at the point in question was of unusual length. When the wind blew the wire swayed and came in contact with the guy wire, forming an arc, which melted the electric light wire and caused it to fall. It carried a current of 2,200 volts of electricity, which was enough to cause death if it touched a human being. This condition had existed so long that those who maintained the electric wire knew or should have known of the imminent danger.

While the jurors were not bound to find these facts they could have found them as thus stated, and without reciting all the evidence bearing upon the negligent maintenance of the electric wire and the freedom of the decedent from contributory negligence, we think a case was made for the jury upon these questions.

The defendant, however, denied that he owned the wire when it fell upon the decedent, and testified that some time before he had sold his entire plant to a corporation, organized and controlled by himself, known as the Kane's Falls Electric Company. The certificate incorporating that company was filed on the 14th of June, 1898, the defendant, his wife and one West being the incorporators, trustees and the only stockholders. The defendant, who owned substantially all the stock, was elected president and Mr. West secretary and treasurer. This was about four months before the accident. More than two months after the accident the defendant, by a writing under his hand and seal, transferred to said corporation his " contract and franchise for the lighting of the streets and public buildings of the village of Whitehall with electricity, and all the benefits, rights and privileges to be derived therefrom," and the trustees of the village, by resolution, consented to such transfer, released the defendant from his bond and accepted the bond of the assignee in place thereof.

The defendant testified that in June, 1898, a resolution was adopted by the trustees of the Kane's Falls Electric Company to purchase from him " the property, leases and contracts " that he had in Whitehall, in consideration of " $24,000 worth " of its stock and that he at once transferred the same to the

company by an instrument in writing. Neither the minute book of the company nor that assignment was produced, as the defendant testified that they had been destroyed by fire, although the assignment of December, 1898, usually kept in the same place, was not destroyed. The defendant also testified that the June assignment was delivered at the time the resolution to purchase was adopted by the trustees, and that aside from himself, Mrs. Ashley and Mr. West were the only persons present. Mrs. Ashley was not called as a witness, and Mr. West said that he thought such a resolution was passed, but he had no recollection of the assignment from the defendant. At a later stage in his testimony he was certain that the resolution was passed, but still he could not remember any assignment. Mr. West was manager both for the defendant and the company.

The defendant was a lawyer and a man of large affairs. He was extensively engaged in business, interested in six power and electric companies and the president of at least two. His memory was not always reliable. On the first trial he said that the transfer of June, 1898, was by a resolution to purchase and that he was not sure that there was any other, although he thought there was, " but not of the lease," while on the trial under consideration, his recollection, refreshed as he said by reflection and by questions put to him, was clear that there was a written transfer, which included the lease signed by himself, and he stated the form and contents thereof in detail. He was not certain when the fire occurred that destroyed the minute book and the first assignment, stating at first that it was "about a year or two after this incorporation, somewhere about 1900," and later that " it was 1898, or 1899, or 1899 and 1900." On the first trial he said that " it was January 13th, 1900." The first assignment was not presented to the village trustees in December, 1898, when they consented to a transfer of the franchise, because, as the defendant explained, the original paper " embodied a transfer of the property and the lease  *  *  *  and was not a thing that the board of trustees had any interest in." He also

attempted to account for the failure to produce the first assignment before the trustees by saying that the corporation was about to transfer the lighting property to Bertron & Storrs, but when the assignment to that firm, dated November 20th, 1900, was shown him and he was asked, " You take that back ? " he answered, " Yes, sir," and thus his testimony closed.   The assignment to Bertron & Storrs executed by him as president of the Kane's Falls Electric Company recited the assignment to that company of December, 1898, but made no mention of any previous assignment.   The second assignment, made after the accident, was the only one presented to the trustees of the village.   They were never asked to consent to a transfer of the lighting contract until December, 1898, two months after the death of the plaintiffs' intestate.

Three policies of insurance, which " were continuous renewals from year to year of other policies," were read in evidence, each issued by a different company and dated May 7th, 1900, whereby the defendant was insured for one year from that date against loss by fire on his engines, dynamos and electrical fixtures belonging to the electric plant in question. These policies were issued at the request of Mr. West, and on November 20th, 1900, they were made payable to the Kane's Falls Electric Company, and on January 5th, 1901, to Bertron & Storrs as their interest should appear.   The premiums were paid by a check of the electric company, and Mr. West testified that the policies were renewed in the wrong name through his own oversight.   Evidence was given tending to show that all payments by the village for electric service were made to the Kanes's Falls Electric Company ; that the first payment was made June 1st, 1898, which was two weeks before that company was incorporated ; that to some extent before, and altogether after incorporation, the business was done in the name of the company, which kept a bank account and paid the employees, and that certificates of stock were issued to the defendant and his associate stockholders in June, 1898.

As the plaintiffs were nonsuited at the trial, they are entitled on appeal to the most favorable inferences that can rea-

sonably be drawn from the evidence, including every fair deduction from the undisputed facts. When one reasonable mind can infer from all the evidence that a controlling fact was proved, while another reasonable mind can infer that it was not proved, a question is presented for the jury. (*Matter of Totten,* 179 N. Y. 112, 116.) The justices of the Supreme Court who have considered this case both at the Trial Terms and in the Appellate Division, differed as to the inferences warranted by the evidence. The same difference of opinion exists in our own minds and we can render judgment only by the vote of a majority.

While the testimony of a single witness, if believed, is sufficient to establish any fact in a civil action, still it need not be believed if the witness is interested, or his statements, even if uncontradicted, are inconsistent with his own conduct, or so improbable as to require explanation. If a fair argument can be made against the probability of his story, his credibility presents a question for the jury. Even if they do not think that he intended to speak falsely, still they may reject his testimony if they are satisfied that he was mistaken owing to interest, bias, a defective memory or any other reason springing from the evidence.

Upon the trial of the case now before us the plaintiffs established a *prima facie* case, which cast on the defendant the burden of establishing some defense. He tried to prove that he did not own the fatal wire at the time of the accident, and substantially all the evidence to establish that essential fact was given by himself. He was an interested witness, because the entire weight of an adverse verdict would have fallen upon him. The vital question whether he transferred his lighting plant and privileges before or after the accident, rested mainly upon his own testimony. Mr. West corroborated him as to a minor point but virtually contradicted him as to the vital point, for, while present and taking part in the business transacted he failed to remember the controlling fact. The close relation existing between these men and the failure of the defendant to produce his wife as a witness,

are not without significance. The imperfect memory of the defendant and the variance in his testimony upon the different trials have already been pointed out. The first assignment was never presented to the village trustees or made known to them in any way, or alluded to in any of the subsequent assignments read in evidence and no witness except the defendant ever saw it or heard of it. The destruction of the first assignment by fire and the preservation of the second; the failure to produce any written evidence even suggesting the existence of the first and the production of an abundance relating to the second; the failure for six months to apply for the consent of the village trustees, the issue of the insurance policies to the defendant and the frequency with which he felt called upon to explain his testimony bore upon the probability of his story.

The evidence presented a question of fact, for the defense rested essentially upon the credibility of the defendant. (*Saranac & Lake Placid R. R. Co.* v. *Arnold*, 167 N. Y. 368, 374; *Volkmar* v. *Manhattan Ry. Co.*, 134 N.Y. 418, 422; *Honegger* v. *Wettstein*, 94 N. Y. 252, 261.) The jury could have accepted his explanations as reasonable and could have believed his entire story, or they could have rejected it as improbable under all the circumstances. It is not for us to intimate and we do not intimate which they should have done. We simply decide that the case should have been sent to the jury for decision, and hence we reverse the judgments below, and grant a new trial, with costs in all courts to abide the event.

CULLEN, Ch. J., HAIGHT, WILLARD BARTLETT and HISCOCK, JJ., concur; GRAY and WERNER, JJ., dissent on the ground that there is no dispute in the evidence as to the ownership and operation of the electric wire by the corporation.

Judgments reversed, etc.