COSTIGAN v. NEW YORK & S. RY. CO.

(Supreme Court, Appellate Division, Second Department. February 13, 1914.)

1. MASTER AND SERVANT (§ 286*)—INJURIES TO SERVANT—JURY QUESTION.

Under Laws 1890, c. 565, § 42a, as added by Laws 1906, c. 657, providing that if a railroad employé shall be injured through any defect in the ways, works, machinery, tools, or implements of the corporation, the proof of such defect shall be prima facie evidence of negligence of the corporation, proof that a street railway conductor was injured in operating a defective electric switch in the line of his duties makes out a case for the jury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1001, 1006, 1008, 1010–1015, 1017–1033, 1036–1042, 1044, 1046–1050; Dec. Dig. § 286.*]

2. MASTER AND SERVANT (§ 88*)—RELATIONSHIP—CREATION.

The relationship of master and servant cannot be created without the assent of both parties; and the fact that a railway company which had employed plaintiff entered into a unilateral agreement with another company whereby the second company was to operate the line and pay over the surplus earnings to the first company, would not change plaintiff's status as an employé of the first when not notified of or agreeing to the change.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 144–151; Dec. Dig. § 88.*]

3. MASTER AND SERVANT (§ 288*)—INJURIES TO SERVANT—JURY QUESTION—ASSUMPTION OF RISK.

In a personal injury action by a conductor on a street railway line, who was injured in operating a defective electric switch which signaled to other cars that he had the right of way, the question of his assumption of risk *held*, under the evidence, for the jury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1068–1088; Dec. Dig. § 288.*]

Appeal from Trial Term, Westchester County.

Action by Michael Costigan against the New York & Stamford Railway Company. From a judgment on a directed verdict for defendant, plaintiff appeals. Reversed and remanded.

See, also, 148 App. Div. 930, 133 N. Y. Supp. 1117.

Argued before JENKS, P. J., and BURR, CARR, RICH, and STAPLETON, JJ.

Charles F. Dalton, of Port Chester (Anthony J. Ernest, of New York City, of counsel), for appellant.

C. M. Sheafe, Jr., of New York City, for respondent.

STAPLETON, J. [1] The plaintiff sustained severe and lasting personal injury on the 13th day of April, 1908. He attributes his injury exclusively to the negligence of the defendant. He asserts the defendant was his master. The physical cause of his injury was an electric shock of sufficient violence to throw him a distance of six or seven feet. The shock was caused by a defective electric light switch attached to a pole on the side of a railroad track. It was the duty of the plaintiff, as a car conductor, to use that switch to indicate, by an electric device, to his fellow servants in charge of other cars coming from the opposite direction on a single track street surface rail-

way that plaintiff's car had the right of way. The trial court correctly declined to take from the jury the question of the negligence of plaintiff's master. Section 42a, c. 565, L. 1890, as amended by chapter 657, L. 1906. At the close of the entire case the defendant moved to dismiss upon stated grounds, but the court, after taking the matter under advisement, directed a verdict for the defendant upon the grounds: First, that the defendant ceased to be the plaintiff's employer on the 31st day of May, 1907, and thereafter and at the time of the accident was not in control of or operating the railroad; and, secondly, that the plaintiff, by continuing to use the switch for a year or more after he knew he was likely to receive an electric shock, and after he had repeatedly received such shocks, must be regarded as having assumed the risk. From the judgment entered accordingly the plaintiff appeals.

Upon the question of proper defendant: The plaintiff began service with the defendant as a conductor in the fall of 1901. He was hired by Charles Singer, who was president of the New York & Stamford Railway Company. He received a badge bearing the name "New York & Stamford Ry. Co.," which he continued to wear until the time of the accident. The car of which he was in charge bore the name "New York & Stamford." His copy of the book of rules, issued to him by an official of the defendant and unrecalled at the time of the accident, bore the name "New York & Stamford Railway Co." Some of the cars were marked "Consolidated Company," some "New York & Stamford," and some "Connecticut Company," but at the time of the accident two-thirds of them were marked "New York & Stamford." The trip slips were marked "New York & Stamford Railway Co.," but some were marked "The Connecticut Company." Plaintiff did not know about the Connecticut Company becoming interested in the New York & Stamford Company in 1905. Other witnesses, employés of the railroad, testified that they worked for the New York & Stamford Railway Company in April, 1908, and that they never received notice of any change in proprietorship, management, or control of the road. Their slips were marked "New York & Stamford," although slips marked "The Connecticut Company" were used for a little while. Badges, similar in construction and appearance to plaintiff's Exhibit 1, and bearing the name "New York & Stamford Ry. Co.," were worn by them. They had books of rules similarly marked.

For the defendant evidence was offered to show that the operation and control of the New York & Stamford Railway Company was taken over by the Connecticut Company by a contract, which the defendant calls a lease, alleged to have taken effect on the 31st day of May, 1907, although not attested until the 28th day of June, 1907, nor recorded until the 13th day of July, 1907. Upon its face the contract shows no consideration, either for the making of the so-called lease on the part of the New York & Stamford Railway Company, or for the performance of the acts upon the part of the Connecticut Company. It recites that:

"The Connecticut Company shall have a right to use the railroad of the New York & Stamford Railway Company within the state of New York,

\* \* \* and to demand and receive for its use and benefits all the toils [sic], income and profits to be derived from the operation of said railroad and railway"

—but there is no provision for payment to the Connecticut Company for any services to be rendered. Out of the gross earnings it shall pay all the expenses of operating, all sums due as interest on the bonded debt of the New York & Stamford Company, and shall pay over the *balance* monthly to the New York & Stamford Company, or to such person or persons as the New York & Stamford Railway Company shall designate.

The Connecticut Company paid the taxes of the New York & Stamford Railway Company from July 31, 1907, to November 1, 1908. The New York & Stamford Railway Company "took back" the road in November, 1908, and has operated it ever since. In the office of the Secretary of State there is no record of the Connecticut Company's having designated any person in this state upon whom process might be served. The badges, slips, etc., bearing the imprint of the New York & Stamford Railway Company, were changed to "Connecticut Company" as soon as possible by the Connecticut Company. From the general manager down, there was no change in the officers or employés of the New York & Stamford Railway Company at the time or subsequent to the making of the alleged lease. The certificates of the respective companies, attached to the instrument, show that one John G. Parker was the secretary of each.

[2] The instrument referred to spells nothing but agency, and agency without compensation. All the work is to be done by the agent, and when everything is done, and all debts and fixed charges paid, the balance shall go to the principal. The instrument contains no demising words. It transfers no interest in rolling stock or real estate. The Connecticut Company had the right to use the road and to collect fares for the benefit of the New York & Stamford Company. Control and operation of the road was not necessarily and certainly relinquished by the written instrument, and it and the other evidence adduced by defendant upon the issue of control, considered in connection with the plaintiff's evidence, presented a question of fact for the jury. We know of no way that the contract relationship of master and servant can be created without the consent or assent of both parties, express or implied. A lawful relationship, once established, is presumed to continue until there is evidence of change, and no clandestine, unilateral manipulation can affect the relation. Chesapeake & Ohio Ry. Co. v. Howard, 178 U. S. 153, 159, 161, 162, 163, 20 Sup. Ct. 880, 44 L. Ed. 1015; Gordon v. Ashley, 191 N. Y. 186, 193, 83 N. E. 686; Jones v. New York Central & H. R. R. R. Co., 134 App. Div. 39, 41, 117 N. Y. Supp. 1113; C., I. & B. R. R. Co. v. Brooklyn Cable Co., 53 Hun, 169, 170, 6 N. Y. Supp. 108; Spaine v. Stiner, 51 App. Div. 481, 484, 485, 64 N. Y. Supp. 655, affirmed 168 N. Y. 666, 61 N. E. 1135; Berry v. New York Cent. & H. R. R. R., 202 Mass. 197, 202, 88 N. E. 588; Norman v. Middlesex & Somerset Trac. Co., 71 N. J. Law, 652, 657, 60 Atl. 936.

[3] As to the question of assumption of risk: Plaintiff testified

that previously he had received shocks at this switch, and had complained thereof to the adjusters at the office. He said at the office that it was dangerous to be turning it on and off. Sometimes they laughed it off as a joke, and at other times they said they would have it fixed, and that there would be a double line shortly, obviating the necessity of using the switch, and that until then they would have to do the best they could. They would send men down along the line to make repairs, "and you would see them working on it the next time you came along." He had received shocks before, but not very serious shocks. He had seen motormen shocked at this particular place. Six months before the accident he made a report concerning the condition of the switch. After that, until the accident, he did not receive any shocks. The shocks did not knock him down; he had never been knocked down before. They were serious enough to alarm him. He did not think he was running any risk at all; he did not think the shocks would be serious enough to do him any harm. He had not seen anything to make him believe that that condition would injure anybody seriously. He never thought he was in danger in using the button that year.

Witness Charles Waterbury received a great many shocks from this switch before the 13th of April, 1908. He received about 20 or 30 shocks before that date. He made many complaints to the officials of the company at the office, and they promised that the matter would be attended to. He continued to use the button without knowing whether it had been repaired or not.

Witness William J. Preston, about a month or two before April 13, received quite a few shocks and made complaint to the adjuster at the office. They said they would have it fixed.

Witness Alexander Scott assisted in repairing the switch, but never saw anybody receive a shock from it. The repairs would consist of a new fuse or a new switch.

Witness Charles F. Wager received several shocks at this switch prior to April, 1908. He complained to the inspector on the road. He told the inspectors it was "hot." They replied that all he got there would not harm him. If it was a wet day they would be sure to get something. He never considered this key a serious matter. He did not know of anybody else who ever received a serious shock.

Witness Harry Ward received slight shocks, especially if the day was wet. He did not recall receiving any shocks shortly before the 13th of April, 1908. He made no complaint.

"When you put your hand up to the button, it was just as if something hit your hand and knocked your hand back."

Witness Harry Turner would get a shock—touched up a little— once in a while. When he got a shock it would make him jump; that was all; it would startle him.

Louis Flood, another witness, received shocks 15 or 20 times. The shocks would shake him up a little. He made complaint at the office, and was told it would be attended to right away.

We think it was for the jury to determine whether the plaintiff acted with reasonable prudence and discretion under all the circumstances. The danger was not so obvious to a man unskilled in elec-

tricity, especially in view of the attitude of defendant after notice of the defect, charged as it was with an affirmative duty to furnish implements without defects. Hawley v. Northern Central Railway Co., 82 N. Y. 370; Kain v. Smith, 89 N. Y. 375, 385; Lynch v. American Linseed Co., 113 App. Div. 502, 505, 99 N. Y. Supp. 260.

The learned trial court erred in not sending the case to the jury, and the judgment must be reversed, and a new trial granted, costs to abide the event. All concur.