CONRAD LONG

*vs.*

FRANK B. SWEETEN, Trading as B. F. Sweeten and
Son, and THE MAYOR AND CITY COUNCIL OF
BALTIMORE, a Municipal Corporation.

*Municipal corporations: streets; liability for—; hidden defects;
contractors' liability. Witnesses: hostile or interested in
other side; cross-examination; contradiction. Ap-
peals: review of rulings on questions
asked witnesses. Prayers:
no evidence.*

A municipal corporation is not liable for injuries received
from defects in the street of which it received no notice, and
which defects were not apparent on the surface of the street.
p. 92

A contractor, doing work on a street for the City of Balti-
more, and sued jointly with the Mayor and City Council for
damages for injuries received by the plaintiff from hidden
defects in the street, can not be held liable under a count in the
declaration charging the Mayor and City Council with negli-
gence of its duty, under the city's charter, to keep the streets in
repair.                                    p. 92

The cross-examination of a witness should, in general, be lim-
ited to matters brought out by the examination in chief.
pp. 94-95

Where one party calls a witness who is more interested in establishing the contention of the other side, the party calling him is not precluded from contradicting statements of such witness, brought out by the other side on cross-examination, nor is he precluded from relying on the testimony of other witnesses.
                                                          pp. 94-95

If there is *any* evidence in a case proper for the jury to consider, it is error to grant a prayer that withdraws the case from their consideration.                                   pp. 96-97

Where an appeal is taken from the action of a court in sustaining an objection to a question, which had been raised before the question was answered, the Court of Appeals, in reviewing such ruling, will not assume that the answer would have been inadmissible.                                           p. 97

*Decided March 19th, 1914.*

Appeal from the Court of Common Pleas of Baltimore City.   (ELLIOTT, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*John Holt Richardson* and *George Washington Williams,* for the appellant.

*George M. Brady,* for the appellees.

*S. S. Field,* City Solicitor, and *Robert F. Leach, Jr.,* Assistant City Solicitor, filed a brief for the Mayor and City Council.

*Maloy, Brady & Embert,* filed a brief for Frank B. Sweeten.

BOYD, C. J., delivered the opinion of the Court.

The appellant sued the appellees for injuries to his horse which resulted in its death, caused by the ground on Frederick street, between Water and Lombard streets in the City

of Baltimore, giving way and the horse sinking into a hole. It is alleged in the *narr.* that the "ground giving way in said street, and permitting said horse to sink in said hole, and receive said injuries, was caused by the improper and negligent filling in of a ditch by the said Frank B. Sweeten, which ditch was dug by the said Frank B. Sweeten for and at the instigation of the said Mayor and City Council of Baltimore. And the plaintiff further avers that the said injuries to said horse were due entirely to the negligence and want of care on the part of the defendants, their agents and servants, in the premises, in not properly and carefully filling in said ditch," etc.

Two exceptions were taken to the rulings on evidence offered, and a third to the rulings on the prayers. We will first consider the latter. Two prayers were granted at the instance of the Mayor and City Council of Baltimore, and one at the instance of the defendant Sweeten. The first instructed the jury that there was no evidence legally sufficient to entitle the plaintiff to recover against the Mayor and City Council; the second was similar to the first, excepting it referred to the pleadings; and the third was similar to the second, excepting it referred to defendant Sweeten. A prayer offered by the plaintiff was rejected, but the principal question for our consideration is whether there was legally sufficient evidence, under the pleadings, to entitle the plaintiff to recover against either defendant.

Frank B. Sweeten, trading as B. F. Sweeten & Son, built a sewer on Frederick street, under a contract with the City. The main line of that sewer from Lombard to Water street was laid two feet west of the west curb line of Frederick street. There is a lateral line which runs in the alley north of Lombard street, east from the main line on Frederick street. That lateral line is four feet north of the south building line of the alley, which is between thirteen and fourteen feet wide, and starts two feet east of the west curb line of Frederick street, and runs across Frederick street up the alley. It was begun on September 4th, and was completed

on the 20th of September, 1912, being paved over to the building line of the alley up to the east building line of Frederick street.

The plaintiff was employed by the George Long Contracting Company, which paved Frederick street from Pratt to Lexington street, and the plaintiff owned the horse which died from the injuries received. On December 19th, 1912, his team came up Frederick street with a load of gravel. His company had taken up the cobble stones and had finished the grading, ready to put on the concrete for the pavement. At the place where the accident occurred about five inches of dirt had been taken off and the cobblestones were about five inches in depth. The plaintiff, who was in charge of the work being done by his company, testified: "As the horses passed me on the east side of Frederick street, about six feet from the curb, at the alley back of Guth's chocolate place, then the horse went down with his left hind leg and tried to jump out but fell back. There was a piece of lagging sticking up about five or six inches above the dirt. That they got the horse out of the hole, apparently unhurt," but subsequently it was found to be injured and died. He said that before the horse went in the hole the appearance of the ground was all right—that the hole was about three and a half feet deep. "There was not anything but a shell hole in the dirt. There was no dirt in there. The horse did not sink in any dirt, as there was no dirt there. It was a shell about that large, and all under that was hollow. The horse went down until he could not get any further. His stomach is what held him up. That he saw lagging in the hole. That lagging are the planks that they drive down in a ditch when men are working in there to keep the side of the ditch from falling on them. The lagging did not show before the accident. That he saw two pieces running north and south. That the horse when he fell struck his stomach on one of the pieces of lagging. That he cut no lagging off at this particular place."

The appellant in his brief claims the right to recover on one of the two grounds mentioned—either that the work was negligently done by Sweeten in behalf of the city, or if that be not established, that the city is liable for a violation of its duty to keep the streets in good repair and reasonably safe for travel. There are several difficulties in the way of his recovery on the second ground. It will be remembered that two of the prayers expressly referred to the pleadings, and there is no allegation in the *narr.* that the city failed to perform its duty to keep this street in repair. Moreover, there is no evidence that would sustain the case on that theory. The plaintiff and his driver proved that there was no indication of anything wrong with this street, but on the contrary, as stated by the plaintiff, "the appearance of the ground before the horse went in was all right," and as the driver said, "The street looked solid to him." There was no attempt to prove notice to the city that there was any defect in the street, and as shown by the plaintiff's evidence there was nothing to attract the attention of the officers of the city to it. In addition to that the suit was against the city and Sweeten jointly, and even if the city had been liable on proper allegations and proof on the ground just referred to, of course Sweeten would not have been liable.

So we are brought to the question of liability on the ground alleged in the *narr.*, as shown above. The theory upon which the prayers of the appellees were granted seems to have been that, "There is no evidence of a ditch or of any filling in, negligent or otherwise," and they rely upon the testimony of Mr. Caples, who was an Inspector of the Sewerage Commission in the laying of this sewer, as the only person who testified and who was present when the city work was being done by Sweeten. It is true that Mr. Caples testified that they tunnelled for this lateral line on account of obstructions, that the top of the tunnel was about seven and a half feet below the surface of the street, and "We did not disturb anything above the roof of the tunnel," and also said: "When the main

line was laid there was another man there who was there all the time. I went there as often as I could, but, after the main line was finished, I went there personally and laid all lines that went across Frederick street." His testimony undoubtedly tended to show that there was no ditch or trench made on or near the surface where the injury took place, but we cannot say as a matter of law that there was no legally sufficient evidence to the contrary.

There was, according to the uncontradicted evidence a hole in the street into which the horse's leg sank, and there was lagging there, which it is claimed caused the injury to the horse. There was also undoubtedly some evidence that there was a ditch or trench where the hole was. Philip Miller, the driver, said: "There was nothing there to indicate that there had been a trench there. There had been trenches there. Where the horse went in that was a trench. It was not filled in right," and John S. Price, who was in the employ of the City as Water Inspector at the time of the accident, said: "Just as he (the driver) dumped (the gravel) the horse went into the sewer or into this hole. I don't know whether it was a sewer or not, but there was a hole there where there had been a ditch dug and lagging put down. He saw lagging there. He saw lagging sticking up about three or four inches from the top and running straight down, but he could not tell the depth of it. The lagging was about three or four inches below the grade of the street, and the dirt gave way and of course on that side the lagging held it and it was only a little crust on top. The lagging you could not see until the dirt gave way. The hole was pretty deep, about four or five feet. Maybe it was five or six feet deep," and on cross-examination he said, "that the hole might have been 3 to 5 feet deep, or $3\frac{1}{2}$ to $5\frac{1}{2}$ feet deep."

The plaintiff testified: "That after the horse sunk into it, the ditch appeared to have settled. That he filled up the hole and rammed it. It took about a half load of dirt to fill the hole. That it was necessary to fill the ditch as it had settled

and he had to fill it up and ram it and concrete over it before
we could go on with our work.   That he had dug thousands
of ditches such as this one."   He also said what we have
quoted above from his testimony.   Mr. Rogers, Secretary of
the Sewerage Commission, produced the contract and plans,
and the record shows that he said "that the guarantee as to
the length of time *these ditches* are to remain and the length
of time the contractors were responsible for them, was *main-
tenance* nine months from the date of completion."

It is true that the defendants called no witnesses, and that
Mr. Caples was produced by the plaintiff, but he was the
inspector for the city when this work was done, and his testi-
mony, relied on by the appellees, was brought out on cross-
examination by them.   The appellant proved by him only the
location of the main line on Frederick street, in relation to
the curb, and of the lateral line, from the main line up the
alley, the width of the alley, and the time when the work was
done, but did not examine him as to the construction of the
lateral line.   The defendants undoubtedly made him their
witness as to a good deal of his testimony.   In *Griffith* v.
*Diffenderffer,* 50 Md. 466, this Court said that in England,
"if a witness is called to prove any facts connected with the
case, he becomes a witness for all purposes, and the other side
may cross-examine him in regard to all matters relevant to
the issues before the jury.   In this country the Supreme
Court has decided that this right is limited to facts and cir-
cumstances connected with the matter stated by the witness
in his *direct examination;* and if the other side proposes to
examine him respecting other matters, they must do so by
making him their own witness * * *.   And this seems to us
to be the better practice."

Just where the line must be drawn between what is and
what is not, properly speaking, cross-examination, is not al-
ways easily determined, but in a case such as this where the
one side calls a witness who would be more interested in es-
tablishing the contention of the other side, the former is at

least not precluded from contradicting statements of the witness brought out by the other side on cross-examination, or from relying on the testimony of other witnesses. It may be that Mr. Caples was better informed as to what was done in making this lateral line than any other witness who testified, but that could only affect the weight of the testimony and did not prevent the plaintiff from relying on the other evidence. It cannot be correctly said that all of the evidence we have before us was offered by the plaintiff, for although it was all given by witnesses produced by the plaintiff, the material part of that of Mr. Caples was in fact brought out by the appellee and not by the plaintiff.

Some stress was laid by the appellees on the evidence of the plaintiff as to the place where the accident occurred. He said it was about six feet west of the east curb line of Frederick street, and, "about in the center of the alley in the rear of Guth's Chocolate Place"—meaning doubtless if that alley was extended to the center of, or across, Frederick street. Another witness said it happened on Frederick street, "right in front of the alley, he supposed five or six feet from the curb if it went straight across the alley." Mr. Caples said in his direct examination, that, "This lateral line runs four feet north of the south building line of the alley. The alley is between 13 and 14 feet wide." It is therefore argued that the hole into which the horse sank could not have been the result of this lateral sewer being laid, for if it was about the center of the alley that would be 6½ or 7 feet from the south building line of the alley, while the uncontradicted evidence was that the lateral line runs four feet north of the building line. But if the line of pipe is four feet from the building line, there was some excavation beyond that. Mr. Caples testified that the opening in the tunnel, in which he said the pipe was laid, was about four feet high and about three feet wide and when the width of the vertical timber is added, the lagging must have reached to about the center of the alley extended. The witnesses did not say that the hole was precisely in the center of the alley, but if it was north of the

lagging on the north side of the tunnel or ditch, whatever it be called, it must have been near the center of the alley.

The facts are that this line had been completed just three months before the accident, that there was a hole there, and lagging at its side, which caused the injury to the plaintiff's horse, and there was testimony that there was a ditch or trench there. There is no evidence that any other work of this character had been done at or about that point, in which lagging was used, or a ditch or tunnel dug, and although the hole was not as deep as Mr. Caples said the top of the tunnel was below the surface, that was for the jury, and if in point of fact the tunnel was negligently filled in, it might well have resulted in the ground falling in. We do not understand just how Mr. Caples figured the top of the tunnel as being about 7½ feet below the surface of the street. He said the bottom of the tunnel was eleven feet under the surface of the street, and they put in six inches of gravel and four inches of concrete, and the opening of the tunnel was about four feet high. That would only leave six feet and two inches above the tunnel, not taking into consideration the thickness of the roof, and if we deduct the five inches of cobble stones and five inches of dirt which the plaintiff had removed before the accident, it was not much over five feet from the top of the tunnel to the surface of the street, after the cobbles and dirt had been removed. The witnesses variously estimated the hole to be from 3½ to 5½ feet deep.

We have thus stated the facts more fully than is customary, but this case depends upon whether there was any legally sufficient evidence under the pleadings to go to the jury, and as there are some peculiar circumstances, we thought it proper to refer fully to the testimony. Whether or not Mr. Sweeten or other witnesses could have cleared up some of the doubtful questions we cannot say, but as Mr. Sweeten did not testify and no evidence was offered by the defendants beyond the cross-examination of Mr. Caples, we feel constrained to hold that the case as presented should not have

been taken from the jury, and the plaintiff's prayer should have been granted.

We are also of the opinion that there was error in not allowing the question included in the first exception—"What in your opinion caused the settling of this ditch?"—to be answered by the plaintiff. He was in the contracting business and had been working in that business since he was a boy—"in streets and earth and things of that kind." He said, "He had dug thousands of ditches such as this one," which, if intended to be accurate, must have kept him quite busy, as he was only 37 years of age when he testified. He was then in charge of the paving of Frederick street, saw the accident and the place where it occurred. Nor do we see any reason why he should not have been permitted to answer the question in the second exception. After saying there was a hole under the five inches of dirt, he was asked if he knew what caused that hole. It may be that his answer would not have been such as would have justified its admission, but for aught the Court knew he might have testified as to what Mr. Sweeten or some one authorized to speak for one or both defendants told him, or his knowledge of such matters may have enabled him to testify in a way that would have been of service to the jury. If those questions had been allowed, it is possible that there would have been a different ruling below on the prayers. It follows that the judgment must be reversed.

*Judgment reversed and a new trial awarded, the appellees to pay the costs.*