PROCTOR ELECTRIC COMPANY, ETC. *v.* ZINK, ETC., ET AL.

[No. 208, September Term, 1957.]

*Decided May 20, 1958.*

The cause was argued before HENDERSON, PRESCOTT and HORNEY, JJ.

*Thomas G. Andrew,* with whom were *Rollins, Smalkin, Weston & Andrew* on the brief, for the appellant.

*Milton I. Vogelhut* for Alan R. Zink.

*Edward L. Putzel,* with whom was *August Levene* on the brief, for Gilbert Cummins & Co., Inc.

PRESCOTT, J., delivered the opinion of the Court.

Proctor Electric Company (Proctor), the plaintiff below, has appealed from a judgment for the appellees, Alan R. Zink, trading as Western Welding Company (Zink), and Gilbert Cummins & Company, Inc. (Cummins), for costs, entered by direction of the trial court at the conclusion of the plaintiff's case.

When reviewing the correctness of the direction of a verdict in favor of the defendants, we must resolve all conflicts in the evidence in favor of the plaintiff and assume the truth of all evidence and such inferences as may naturally and legitimately be deduced therefrom which tend to support the plaintiff's right to recover.

Cummins is engaged in the business of electroplating and the manufacture of metal furniture. Proctor rented from Cummins space that was not definitely defined in one of Cummins' buildings together with the services of a tow motor operator for the storage of certain of Proctor's goods. The building where the goods were stored was also utilized by Cummins for packing, shipping and manufacturing. On November 10, 1954, Proctor had stored in that building certain bolts of cloth; these bolts were about 5 feet long and were stacked in piles about 6 feet high.

On that date, Philip J. Poggie, a welder employed by Zink was directed by Zink's foreman to go to the plant of Cummins

to weld a cast iron leg on a press for Cummins. He reported to the foreman at the Cummins plant, who showed him the press that was to be welded. It was then standing about a foot away from the pile of bolts of cloth belonging to Proctor. Poggie asked Cummins' foreman to give him a man to assist him in moving the press. Poggie said on cross-examination by counsel for his employer, Zink, that he asked the foreman to have the man stand by during the welding and watch for fire, but on cross-examination by counsel for Cummins, Poggie said that he could not remember whether he told the foreman he wanted the man to stand by and watch for fire. Poggie and the man from Cummins moved the press to a point about six to eight feet away from the bolts of cloth. Poggie stated that he told the man to remain there and watch for fire, and then prepared the cast iron leg of the press for welding and proceeded to weld it with electric equipment. A complete welding of this nature requires about three quarters of an hour. Poggie had a screen with him but did not use it because he thought the welding operation had been moved far enough away so that a screen was not needed. His welding operation was being conducted at a point about 2 feet above the cement floor. During the course of this operation, Cummins' maintenance engineer testified that he walked over, tapped Poggie on the shoulder, and cautioned him to be "careful with your sparks." In ten or fifteen minutes thereafter, the fire broke out.

Poggie further testified that there is always a danger of fire in a welding operation, unless care is taken; and, because of the possibility of fire, it is a custom in the trade to have somebody assist the welder by watching for and protecting against fire. The order blank read in part: "Weld leg on press, ask for Cummins, *will furnish fire watch.*" (Emphasis supplied.) This indicated that Cummins would supply the help to watch for fire. Poggie also testified such a man was there, furnished by Cummins, and both Poggie and Cummins' foreman told the man to stay there and watch for fire, but he did not do so. He also stated that he sometimes uses a screen to protect against fire, and he had such a screen with him on the day of the fire, but did not use it as

he thought the press had been moved far enough away from the bolts of goods to avoid any danger to them from fire.

After welding for some time, Poggie raised his shield to change wires and saw smoke coming out of the middle of the piles of bolts of cloth and "hollered fire." The man from Cummins whom Poggie and the foreman had directed to watch for fire was not there. The smoke was coming from a point thirteen or fourteen feet from the welding operation, and no damage was observed in the bolts of cloth closer to the welding. There were two wires coming out of a fuse box and the wires ended under the bolts of cloth. The witnesses differed as to whether the ends of these wires were bare or taped, but Frederick B. Critzman, an employee of Cummins who was in charge of these wires, said that he had removed the fuses a week or two before the fire and that the wires were dead. No evidence was produced to contradict the testimony that these wires were dead and there was no evidence that these wires were burned after the fire. None of the bolts of cloth were burned in the entirety; there were just "spots," five or six inches in diameter, that went down fifteen to thirty wraps in the coil. Outside of Poggie's welding, there was no other fire in the building except a spot welding at the far end of the building.

Affiliated F. M. Insurance Company of Providence, which insured Proctor against fire loss, paid Proctor's claim and under its right of subrogation sued Zink on the theory that the fire was caused by the negligence of the welder. Zink impleaded Cummins as a third party defendant, alleging that the failure of Cummins' employee to watch for fire caused the loss.

It will be noted that all of the witnesses were produced by the appellant, and they consisted, principally, of employees of the defendants.

The appellees contend that the appellant failed to prove that the fire was caused by the negligence of anyone; that the appellant declined to rely upon the doctrine of *res ipsa loquitur*, but attempted affirmatively to prove negligence and was unsuccessful. They claim that all of the witnesses agreed that the welding took place at least five to eight feet from the

nearest portion of the bolts of cloth, and the witness, Poggie, testified that in his opinion sparks from the welding would not roll more than three feet; consequently, as the fire broke out some thirteen or fourteen feet from the welding, the appellant's own testimony, by which it was bound, conclusively showed that the fire was not caused by the welding operation, and the directed verdicts in their favor were correct. They argue that our decision in the present case should be controlled by the rulings made in the cases of *Hickory Transfer Co. v. Nezbed*, 202 Md. 253 and *Maszczenski v. Myers*, 212 Md. 346. Both of these cases quote from the opinion in the earlier case of *Strasburger v. Vogel*, 103 Md. 85, and the language principally relied upon by the appellees is that found in the *Nezbed* case, 202 Md. at page 263:

> "When the plaintiff invokes this procedure [*res ipsa loquitur*], thus putting his reliance upon the inference of negligence springing from the event, it has been authoritatively held that it must not appear by his own evidence, or the evidence adduced in his behalf, that causes for which the defendant was in no way responsible produced the injuries for which damages are sought."

And, it may be added, the plaintiff's evidence, or that produced in his behalf, should not explain away the inference of negligence, if *res ipsa loquitur* be relied upon.

As we view the case the doctrine of *res ipsa loquitur* need not be relied upon by the plaintiff. That doctrine is, in brief, that when a plaintiff in a negligence case proves that he has been injured (a) by a casualty of a sort which usually does not occur in the absence of negligence, (b) by an instrumentality within the defendant's exclusive control, (c) under circumstances indicating that it was not caused by any voluntary act or neglect of the plaintiff, an *inference* that it was due to the *defendant's negligence* is allowable. *Potts v. Armour & Co.*, 183 Md. 483. Here there was evidence showing or tending to show that there was danger of fire from welding operations, that this was known to the defendants, that there was failure to use a protective screen, and that

there was failure to have a man remain on duty as a watchman to guard against fire. If these were found to be facts (and we do not understand that they are disputed), they would be sufficient to support a finding of negligence on the part of the defendants. Such a finding, if made, would be a conclusion based upon the facts above stated (assuming them to be facts) and not upon an inference that without negligence on the part of the defendants the fires would not ordinarily have occurred. In other words, there was sufficient evidence to warrant (though not to require) a finding of negligence without invoking the aid of a presumption. Negligence, however, is not actionable by itself; to be actionable it must be a proximate cause of the injury claimed.

We see the real question involved in this case is whether the plaintiff offered sufficient circumstantial evidence to permit the issue of the *cause* of the fire to go to the jury. Professor Wigmore suggests the following test for the sufficiency of circumstantial evidence to submit an issue to the jury on behalf of the plaintiff: "Are there facts in evidence which if unanswered would justify men of ordinary reason and fairness in affirming the question which the plaintiff is bound to maintain?" 9 *Wigmore, Evidence* (3rd Ed.), sec. 2494, p. 299. See also *McCormick, Evidence,* p. 636. This Court has stated the rule as follows:

> "A prayer seeking to take the case from the jury on the alleged ground of the total failure of evidence to support the plaintiff's case, will not be granted, if there is any evidence, however slight, legally sufficient as tending to prove. it, that is to say, competent, pertinent, and coming from a legal source; * * * and in considering such evidence, the Court must assume the truth of all the evidence before the jury tending to sustain the claim or defense, as the case may be, and of all inferences of fact fairly deducible from it; and this, though, such evidence be contradicted in every particular by the opposing evidence in the cause." *Spanish American Cork & Specialty Co. v. State, use of Schneider,* 134 Md. 605, 608.

It may be stated in still another manner: when one reasonable mind can infer from all the evidence that a controlling fact was proved, while another reasonable mind can infer that it was not proved, a question is presented for the jury. Measured by this standard, we think there was an abundance of testimony to take the issue of the cause of the fire to the jury. The undisputed testimony showed the welding operation, from which sparks were flying and rolling, was in close proximity to the cloth damaged by fire; no shield was being used; the watchman for fire was absent from his place of duty; the nature and character of the injury to the cloth, round holes five or six inches in diameter, were such as the jury might determine were logically and naturally to be expected from fires caused by sparks; and no other plausible cause for the fire was shown either by affirmative testimony or reasonable inference. The above seems to be fully supported by the following authorities: *Green Ridge R. R. Co. v. Brinkman,* 64 Md. 52; *Spanish American Cork & Specialty Co. v. State, supra; Bresnan v. Weaver,* 151 Md. 375; *Lawrence v. Yadkin River Power Co.* (N. C.), 130 S. E. 735, 737, 738; *Reconstruction Finance Corp. v. Peterson Bros.* (C.C.A. 5th), 160 F. 2d 124, 126; *22 Am. Jur. Fires,* sec. 87. We say no more concerning the evidence than is necessary for our decision; and we want it clearly understood that we express no opinion, and intimate none, on the force and weight to be given the evidence other than it has sufficient probative force tending to prove the issues to require its submission to a jury for their consideration in determining such issues. The weight of such evidence is solely for the jury. *Hodges v. Baltimore Engine Co.,* 126 Md. 307, 314.

The appellees, however, argue that the evidence disclosed that the fire broke out about 13 feet from the welder. They state that Poggie, the welder, testified on direct examination as follows:

"Q. Based on your experience as a welder when one of those sparks drop on the floor do they roll? A. Not all the time. Q. But they do roll? A. Yes, sir, sometimes they will roll, I would say approximately three feet." Then, on cross-ex-

amination he stated that in his opinion three feet was the maximum distance that sparks would travel and (still in his opinion) no screen was necessary in the particular type of welding. They claim that because the appellant offered this witness, admittedly adverse, and he was not contradicted by any other witness or witnesses, the appellant is bound by this testimony and it shows that the fire could not have been caused by sparks from the welding machine. It should be remembered in this connection that Poggie also testified that fire is always a danger in a welding operation if the welder is not careful. And there was no other plausible cause for the fire shown.

It is unquestionably the general rule that a person who produces a witness vouches for him as being worthy of credit, and no direct attack upon his veracity should be made by the party who produces him in the absence of surprise, hostility or deceit. *Murphy v. State,* 120 Md. 229; 3 Jones, *Evidence Civil Cases,* (4th Ed.) secs. 853, 854. In Maryland, we have a statute, Article 35, section 9, Code (1957), which relates to adverse *parties.* It provides that they may be called by the opposite party and interrogated by leading questions, contradicted and impeached. Under this statute, when adverse parties have been called and their testimony not contradicted, this Court has held that the uncontradicted testimony was binding on the party who had called the opposite party. *Morris v. Hazlehurst,* 30 Md. 362; *Mason v. Poulson,* 43 Md. 161; *Harrison v. Harrison,* 117 Md. 607; *Murphy v. Stubblefield,* 133 Md. 23; *Maszczenski v. Myers,* 212 Md. 346. We think this is the settled law of Maryland today, and we have no desire to recede from any of these decisions.

However, they are not to be interpreted as meaning that a party is bound by each and every statement made by an adverse witness called by him, and the court and jury must blindly adopt all such statements simply because no other witness has denied them and the character of the witness is not impeached. As stated in 3 *Jones, op. cit.,* p. 1590.

> "Moreover, a party is not bound by all the statements of a witness called by him, if adverse, even

though no other witnesses are called to contradict him; the party may rely on part of such testimony, although in other parts the witness denies the facts sought to be proved."

In the application of this rule, it is sometimes difficult to determine when a witness has been contradicted in a legal sense. The testimony of a witness may be contradicted or discredited by circumstances as well as by statements of other witnesses, and a jury is not bound to accept a witness' testimony as true if it contains improbabilities, or if there are reasonable grounds for concluding that it is erroneous. *Jones, op. cit.* ps. 1692, 1693; *Elwood v. Western U. Tel. Co.,* 45 N. Y. 549, 6 Am. Rep. 140, 143; Note, *Disregard by Jury of Uncontradicted and Unimpeached Witness,* 81 Am. Dec. 268, 269. It is the jury's duty to take into consideration all the evidence, whether circumstantial or otherwise, tending to disprove any statement of fact made by a witness in the course of his testimony, and thus determine the weight or credibility to be given to such statement. *Ibid.* Without expressing any opinion concerning the weight to be given the evidence, we think in the present case, where the witness was adverse and his crucial evidence relied upon by the appellees was opinion testimony brought out in cross-examination, it was proper for the jury to say whether or not the circumstances or the improbability of his testimony showed that he was mistaken in some of his statements or opinions. There can be no doubt that one who produces a witness may prove the truth of material facts by any other competent evidence even though the effect of the testimony is directly to contradict his own witness. This is done not to impeach the witness, but to show he was mistaken. *Sewell v. Gardner,* 48 Md. 178, 184; *Jones, op. cit.* sec. 857. 3 *Wigmore, Evidence* (3rd Ed.), sec. 908. As one Court said: "(T)he testimony of a single witness * * * need not be believed if the witness is interested, or his statements, even if uncontradicted, are * * * so improbable as to require explanation. If a fair argument can be made against the probability of his story, his credibility presents a question for the

jury. Even if they do not think that he intended to speak falsely, still they may reject his testimony if they are satisfied that he was mistaken * * * (for any) reason springing from the evidence." *Gordon v. Ashley* (N. Y.), 83 N. E. 686. It has been held by one Court that the weight and credibility of oral evidence is for the jury, without reference to who called the witness. *Davis v. Missouri Electric Power Co.* (Mo.), 88 S. W. 2d 217, 221.

The principal case has many similar aspects to the case of *Long v. Sweeten,* 123 Md. 88. There, the plaintiff sued the defendant, a contractor, for the death of the plaintiff's horse, alleged to have been caused by the defendant's negligence when the ground on Frederick street in Baltimore City gave away and the horse sank into a hole. This alleged negligence was the failure to properly fill in a ditch wherein the defendant had laid a sewer for the city. The plaintiff called as one of his witnesses a Mr. Caples, who was an inspector of the Sewerage Commission. During the cross-examination of Mr. Caples, he testified that he was present at the time the sewer was laid at the point where the horse was injured, and, at this point, the defendant tunnelled to lay the sewer (consequently no ditch of any kind was dug by the defendant); that the top of the tunnel was about 7½ feet below the surface of the street and nothing was disturbed above the roof of the tunnel. The defendant offered no witnesses and the court directed a verdict for the defendant, Sweeten. On appeal, the same argument was made in that case as in the instant one, namely, that Mr. Caples was the plaintiff's witness, by which he was bound, and his evidence, if believed, clearly showed that no ditch had been dug by the defendant at the point of the accident. This Court pointed out that it was true that the defendant had produced no witnesses and Mr. Caples had been offered as a witness by the plaintiff, but it could not be correctly stated that all of the evidence had been offered by the plaintiff because the material part of Mr. Caples' testimony was in fact brought out on cross-examination. While there had been no formal motion to require the defendant to make the witness his witness, the Court said: "The defendants undoubtedly make him their witness

as to a good deal of his testimony." The opinion then pointed out that Mr. Caples was probably the best informed witness on the subject of the construction of the sewer and his testimony undoubtedly tended to show that no ditch or trench was made by the defendant, but this only affected the weight of his testimony; and did not prevent the plaintiff from relying on the plaintiff's other testimony to show that such a ditch was dug, concerning which the Court could not say as a matter of law was insufficient to show that Mr. Caples was mistaken. The case was reversed and a new trial awarded so that a jury could weigh the sufficiency of the evidence.

*Judgment reversed, and the case remanded for a new trial, the appellees to pay the costs.*