# RINARD v. NATIONWIDE MUTUAL INSURANCE COMPANY

[No. 247, September Term, 1972.]

*Decided May 14, 1973.*

The cause was argued before MURPHY, C. J., and BARNES, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*William W. Grant* for appellant.

*Mareen L. Duvall, Jr.,* with whom was *Archie C. Hall* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court.

This case arises from the relationship between appellee, Nationwide Mutual Insurance Company (Nationwide), and one of its agents, Richard A. Rinard (Rinard),

the appellant. In 1966 Rinard and Nationwide entered into what Nationwide called "Career Agents Financing Plan Agreement." Under this agreement Rinard was advanced the sum of $125 per week by Nationwide. He agreed "that all commissions, fees and compensation of every kind [then] due or which [might] become due [him] at any time [t]hereafter for any reason from [Nationwide should] be applied against the advances made to [him], and that all such advances [should] constitute a debt due from [him] to [Nationwide]." By August of 1968 he started to receive his standard commissions except that there was to be deducted from the commissions the sum of $50 per month to be applied on the indebtedness, later increased to $64 a month and then to $65 per month.

Nationwide terminated its relationship with Rinard and demanded payment for the sums still due it. Suit was instituted when Rinard failed to pay. He filed a general issue plea and a plea on equitable grounds. He contended, among other things, that Nationwide had not given him credit for commissions on certain policies serviced by him which had been formerly serviced by a retired agent or agents, commissions on which policies he was to receive. So long as he did not ask for an affirmative judgment (*i.e.*, for an amount in excess of Nationwide's claim) he could prove this claim under the general issue plea without having filed a separate counterclaim. *Holloway v. Chrysler Credit Corp.*, 251 Md. 65, 66, 246 A. 2d 265 (1968), and cases there cited.

The trial judge (Naughton, J.) entered a judgment against Rinard in favor of Nationwide. On appeal Rinard raises a number of questions, but we shall address ourselves solely to a question of evidence since our ruling upon that subject will make necessary a new trial.

Nationwide uses some type of data processing insofar as its bookkeeping is concerned which requires identification of agents by number. We perhaps could better understand this case if one of the parties had introduced into evidence the data processing report which was furnished each agent at the end of the month and which was used to cross-examine

Rinard. It is explained that this summary sheet for each agent is sent to the district manager who in turns sends it to the individual agent. The agent signs a copy of the sheet and returns it to the district manager who then forwards it to the central office. The sheets list separately the commission payable on each policy other than automobile policies. Because of the number of policies involved, the commissions payable on the renewal of automobile insurance policies are listed as a lump sum.

The record on cross-examination of Mr. Rinard includes the following:

"Q. Now, Mr. Rinard, do you recall signing these monthly summary sheets? A. Yes sir.

* * *

"Q. Do you disagree with the balance at that time? A. $65.00 deducted from this would bring it out to this balance, that's correct.

"Q. That's correct balance? A. That's correct there.

"Q. The balance being $3,692.42. That's the debt you owed Nationwide at that time, is that correct? A. Yes.

"Q. Do you disagree with that now? A. No. Not at that date.

"Q. At that date $3,600.00 was correct? A. On that date.

"(Mr. Grant) Objection, Your Honor.

"(By the Court) Objection overruled.

* * *

"Q. Just referring for one last question back to the 516's. You never did disagree with the 516's you received did you? A. The 516 with the deduction of $65. made the balance show right. This is what I signed to. That they were deducting $65.00 from this amount.

"Q. The balance on all the 516's were correct then, right? A. With the deduction.

"(By the Court) What was the date of that report, November? A. The one that was just here? That was November the 20th of '69.

"(By the Court) And you're saying the account between you and the Company was correct at that time? A. As far as the deductions on it, yes sir. The deducting of the $65.00 is right.

"(By the Court) Credit? Were you given all of your credits up to that time? A. So far as I know, yes sir."

Mrs. Rinard testified that there came into their possession files of a former Nationwide agent whose renewals were to be credited to her husband. She said that many of these renewals in the period of October through December of 1966 had the number of that former agent on them, although he was no longer with the company. She had assembled and correlated much of this information in an effort to compute commissions due her husband. The record then is as follows:

"(By the Court) What's the purpose of this line of testimony?

"(Mr. Grant) Your Honor, this is to show that these premium renewals were coming [due] in policies that were being held by Mr. Rinard with Mr. Derham's number on them and hence applied to this. Payment was made on the number not on

"(By the Court) Yes. But wasn't that back in '66?

"(Mr. Grant) Yes sir. We have the summaries through —

"(By the Court) Well you're impeaching Mr. Rinard with that testimony. He testified that the report here dated 10/15/69 is correct.

"(Mr. Grant) He testified, Your Honor, that he certified the sheet.

"(By the Court) No, he testified that it was correct, that the figures were correct up to that time. So what I'm interested in is what happened after 10/15/69. You're impeaching him now

through this testimony, or attempting to impeach him as to something back in '66. I guess you go through '67, '68.

"(Mr. Grant) This is to show that a payment of approximately $3,000.00 owed to him by the Company.

"(By the Court) No, it would not be admissible. You would be impeaching your witness there. Mr. Rinard has already testified that the account is correct up until October 15, '69.

"(Mr. Grant) If Your Honor will recall I objected to that to start with. I felt he was being misled. He was asked what he had signed off and he stated specifically that he was signing off that a $65. payment had been deducted against the balance due the Company. He was not signing off that the account was right or not.

\* \* \*

"(By the Court) Well he told me when I asked him if he had been given all his credits and he said up to that time, up to October 15th, yes. So I think this testimony now, Mr. Grant, would be inadmissible because you would be impeaching your own witness. So I will not allow it. If you have anything after October 15th I'll listen to it.

\* \* \*

"If you feel that he's entitled to any credits after October 15th, '69, that he was not given I'll listen to that.

"Q. The Court's restricting us to after October, 1969.

"(By the Court) October 15th. The effective date of the report or the last day of the report."

The testimony of Rinard is subject to two interpretations, that at the time he signed the summary sheet in October or November of 1969 that all of the credits to which he was

entitled at that time were reflected upon the sheet, or that the sheet correctly gave him credit for each of the $65 deductions which had been made.

If we were to assume that the purport of the testimony of Rinard was that the sheet correctly reflected all credits to which he was entitled from Nationwide at the time shown, this still would not be a basis for barring the testimony of Mrs. Rinard. As Judge Prescott put it for the Court in *Proctor Electric Co. v. Zink*, 217 Md. 22, 141 A. 2d 721 (1958):

> "It is unquestionably the general rule that a person who produces a witness vouches for him as being worthy of credit, and no direct attack upon his veracity should be made by the party who produces him in the absence of surprise, hostility or deceit. *Murphy v. State*, 120 Md. 229; 3 Jones, *Evidence Civil Cases*, (4th Ed.) secs. 853, 854." *Id.* at 32.

However, in *Wolfe v. Hauver*, 1 Gill 84 (1843), our predecessors said:

> "[T]he principle is clear and undeniable, that although a party cannot discredit his own testimony, yet he may show that his witness is mistaken, and is not precluded from showing the truth by any testimony, oral or written, which he may produce." *Id.* at 91.

3 Jones, *Evidence, Civil Cases* § 857 (4th ed. 1938) states:

> "The rule which forbids one to impeach his own witness must not be understood to imply that the party is bound to accept the testimony of a witness as correct. On the contrary, the one producing a witness may prove the truth of material facts by any other competent evidence even though the effect of the testimony is directly to contradict his own witness. Accordingly, in an action on a warranty by the defendant's servant, where the servant was called by the plaintiff as a witness and testified that he had given no warranty, the

plaintiff was allowed to prove, by other witnesses, that the servant had in fact given such warranty. Again, a party may offer the books of his witness in evidence although they contradict the witness's testimony. Moreover, a party is not bound by all the statements of a witness called by him, if adverse, even though no other witnesses are called to contradict him; the party may rely on part of such testimony, although in other parts the witness denies the facts sought to be proved. It has been well said that, if a contrary rule should prevail, 'every one would be at the mercy of his own witnesses, and if the first witness sworn should swear against him, he would lose the testimony of all the rest. This would be a perversion of justice.'" *Id.* at 1588-90.

4 Jones, *Evidence* § 26:11 (1972), citing our predecessors in *Franklin Bk. v. Steam Nav. Co.*, 11 Gill & J. 28 (1839), among other cases, says:

"The rule forbidding impeachment of the party's witness does not preclude the party from incidentally discrediting his own witness by showing that statements which have been made by the witness are not in fact true. In other words, by way of further clarification, evidence relevant to the issues is not inadmissible simply because it contradicts the statements of another witness for the same party." *Id.* at 198-99.

This is but little different from the discussions relative to judicial admissions in *Ferguson, Adm'x v. Wootten*, 240 Md. 186, 192, 193, 213 A. 2d 498 (1965), and *Eastern Shore P.S. Co. v. Corbett*, 227 Md. 411, 418-19, 177 A. 2d 701 (1962), a doctrine this Court has not adopted. In *Ferguson* testimony from the plaintiff was to the effect that a traffic light was green when the driver of the car in which she was riding went through it, which might have shown him not to be negligent, while one of her witnesses said it was red. It was contended that under the doctrine of judicial admissions a

verdict should have been directed for the defendant. Judge Oppenheimer said for the Court:

> "In *Welsh v. Porter*, [231 Md. 483, 190 A. 2d 781 (1963)], Judge Henderson, for the Court, said: 'If we assume, without deciding, that a party under some circumstances may be bound by the judicial admission of a fact within his knowledge, we think it has no application in the instant case.' . . . That is true here. The testimony of the appellee did not relate to a fact peculiarly within her knowledge and as to which she could not be mistaken; it was properly treated by the court as merely that of a witness, contradicted by the testimony of other witnesses." *Id.* at 193.

In the circumstances of this case we do not understand the testimony of Mrs. Rinard to have been tendered for the purpose of impeaching her husband, but for the purpose of clarifying his statement. Accordingly, it was error not to permit her testimony and the judgment must be reversed.

It strikes us that this is a case peculiarly suited for the use of an auditor as provided in Maryland Rule 525. No doubt, upon the remand the court and parties will wish to make use of that rule.

> *Judgment reversed; case remanded for a new trial; costs to abide the final result.*