GENERAL MOTORS CORPORATION *v.* GEORGE E. LAHOCKI ET AL.

\* \* \*

GEORGE E. LAHOCKI ET AL. *v.* CONTEE SAND & GRAVEL CO., INC. ET AL.

[No. 38, September Term, 1979.]

*Decided January 30, 1980.*

716

The cause was argued before MURPHY, C. J., and SMITH,
ELDRIDGE, ORTH, COLE and DAVIDSON, JJ.

*Francis B. Burch, Jr.,* and *Edward S. Digges, Jr.,* with
whom were *Joseph G. Finnerty, Jr., Robert Dale Klein, Piper
& Marbury, Otis M. Smith, General Counsel, John P. Raleigh*
and *Douglas E. Brown* on the brief, for General Motors
Corporation.

*Ronald S. Schimel,* with whom were *Paul S. Warshowsky,
Carol B. O'Keefe, Levan & Schimel* and *Joseph M. Bryan* on
the brief, for George E. and Doris Lahocki. *Laidler B.
Mackall,* with whom were *Loren Kieve, Steptoe & Johnson,
William N. Zifchak* and *Sasscer, Clagett, Channing & Bucher*
on the brief, for Contee Sand & Gravel Co., Inc.

SMITH, J., delivered the opinion of the Court.

In this case we shall hold that a trial court erred in its
handling of an agreement between certain of the parties to
litigation before it and also erred in not permitting one aspect
of the case to go to the jury. Hence, we shall reverse the
judgment of the Court of Special Appeals in *Lahocki v. Contee
Sand & Gravel Co.,* 41 Md. App. 579, 398 A.2d 490 (1979).

This litigation is the result of an accident on University
Boulevard in the College Park area of Prince George's
County. Appellant George E. Lahocki sustained a paralyzing
back injury when the vehicle in which he was riding, a van
manufactured by General Motors Corporation (GM), collided

with heavy timber barricades placed by a contractor, Contee Sand & Gravel Co., Inc., in connection with work it was then doing on the highway.

Lahocki and his wife initially sued the driver of the van, the owner of the van (who was Lahocki's employer), and Contee. Contee filed a third party claim against GM, alleging that the van was uncrashworthy. Ultimately, the Lahockis made GM a defendant on the basis of an alleged defect in the van said to have enhanced Lahocki's injuries.

Summary judgment on the basis of the Workmen's Compensation Act was entered in favor of Lahocki's employer. An agreement was reached between the Lahockis and the driver of the van as a result of which they received $300,000 and executed a release pursuant to the Uniform Contribution Among Tort-Feasors Act, Maryland Code (1957) Art. 50, §§ 16-23.

At trial the parties stipulated that the driver was negligent and that his negligence caused the accident. He was then dismissed from the action. A mistrial ultimately ensued.

A pretrial conference was held in advance of the first trial. There the trial judge directed that any settlements effected between any of the parties were to be disclosed promptly to all counsel. GM made a motion at the outset of the second trial "to compel the disclosure and/or production of any agreement or settlement between the [Lahockis] and the defendant Contee," stating its counsel had "information that such an agreement either ha[d] been reached or [was] imminent ...." We shall have more to say about those proceedings and the agreement later.

The trial judge granted Contee's motion for a directed verdict in its favor made at the conclusion of all the evidence. The jury rendered a verdict against GM in favor of Lahocki in the amount of $1,200,000 and against GM in favor of him and his wife in the amount of $300,000. Upon motion of GM, the ultimate judgment was reduced by one-half based upon the existence and terms of the release between the Lahockis and the driver of the vehicle. GM and the Lahockis appealed to the Court of Special Appeals. It affirmed.

We granted GM's petition for a writ of certiorari to address the question, "Is GM entitled to a new trial because a pretrial settlement agreement between the plaintiffs and the codefendant was not disclosed to GM promptly and because it was not admitted in evidence at the trial?" The Lahockis also sought a writ of certiorari, which we granted. One of the questions contained in their petition has been settled. The two remaining questions are: (1) "Whether the Court of Special Appeals' rationale in affirming Contee's motion for directed verdict is in direct conflict with the principle that a wrongdoer is liable for all the foreseeable consequences of his act," and (2) "Whether the trial court erred in granting Contee's motion for directed verdict by misconstruing and misapplying the holding in *Stitzel v. Kurz,* 18 Md. App. 525 [, 308 A.2d 430] (1973)."

## I

### The Lahocki-Contee Agreement

As we have indicated, when the case was called for trial GM sought to compel disclosure of any agreement between the Lahockis and Contee. GM's attorneys suggested that they had information that such an agreement had been reached. The trial judge indicated he presumed that any pro rata type settlement agreement should be made known before trial, but said he was "not sure about any other type of settlement, a high-low settlement agreement, whether or not [GM was] entitled to this." He asked counsel specifically, "Are there any other settlements that should be disclosed, or settlement agreements?" To this the reply was made, "In the context of Your Honor's last statement, there isn't." Further discussion ensued and he was told, "There are no settlements, Your Honor. You made a statement that distinguished between settlements and high-low agreements." The judge responded, "Isn't a settlement a high-low agreement?" Ultimately counsel for GM were excused from the courtroom at their suggestion. It then was disclosed that an agreement had been reached between the Lahockis and Contee.

The agreement provided that after trial Contee would pay

the Lahockis $150,000 except in three circumstances: (1) If Contee's pro rata share of a judgment against it was in excess of $150,000, then Contee would pay this pro rata share to the Lahockis up to $250,000. (2) If final judgment was entered against GM alone, then Contee would pay nothing to the Lahockis, even if the Lahockis and GM thereafter settled the case. (3) If the Lahockis settled with GM, then the sum to be paid by Contee to the Lahockis was to be but $100,000. It will be perceived upon analysis that the effect of this agreement was that if Contee were to succeed in obtaining a defendant's verdict at the trial of the Lahockis' claim against Contee and GM, then Contee would still be obligated to pay the Lahockis $150,000 if the jury also returned a verdict for GM.[1]

---

1. The agreement was in the form of a letter from counsel for Contee to counsel for the Lahockis. Provision was made for the Lahockis and their attorneys to sign at the foot of the letter indicating their approval. The complete text is as follows:

Upon conclusion of the trial of the case of George E. Lahocki and Doris Lahocki v. Contee Sand & Gravel Company, Inc., et al., Defendants, Law No. 61,834, in the Circuit Court for Prince George's County, Maryland, Contee shall pay to plaintiff Lahocki the sum of $150,000, except in the event of any of the following occurrences:

(a) If Contee's pro rata share of any judgment against it is in excess of $150,000, Contee shall pay to Lahocki said pro rata share, not to exceed $250,000;

(b) If final judgment is entered against GMC alone, then Contee shall pay nothing to Lahocki, even if Lahocki and GMC should thereafter settle their case;

(c) If Lahocki settles with GMC, then Contee shall pay the sum of $100,000 to Lahocki.

In the event of an appeal, any sums otherwise required to be paid by Contee to plaintiffs herein shall be placed in an interest bearing account in the name of Laidler B. Mackall, trustee for both parties, and all interest thereon shall be divided equally between Contee and Lahocki, until entry of final judgment.

Such interest payments shall be in lieu of any other payment of interest on said judgment which might otherwise be required to be paid by law.

Finally, nothing contained herein shall operate to release or discharge any other party from liability which may be found against it, except to the extent that same is expressly included in the agreement. This is not a general release.

If the foregoing accurately states our agreement, please affix your signature and deliver a copy of the letter to me on September 14, 1977. Please have Mr. and Mrs. Lahocki sign another copy as soon as practical.

GM sought an order declaring the agreement void. This was denied. It then moved the court to permit disclosure of the agreement to the jury. That likewise was denied.

GM argues that this is a "Mary Carter Agreement," a term used by the court in *Maule Industries, Inc. v. Rountree,* 264 So. 2d 445 (Fla. Dist. App. 1972), *rev'd* 284 So. 2d 389 (Fla. 1973), referring to the agreement in *Booth v. Mary Carter Paint Company,* 202 So. 2d 8 (Fla. Dist. App. 1967). That court said:

> The term arises from the agreement popularized by the case of Booth v. Mary Carter Paint Co., Fla. App. 1967, 202 So.2d 8, and now appears to be used rather generally to apply to any agreement between the plaintiff and some (but less than all) defendants whereby the parties place limitations on the financial responsibility of the agreeing defendants, the amount of which is variable and usually in some inverse ratio to the amount of recovery which the plaintiff is able to make against the nonagreeing defendant or defendants. [*Id.* at 446, n. 1.]

It is probably safe to say that no two pacts dubbed "Mary Carter Agreement" have been alike. However, three basic features seem to be contained in each: (1) The agreeing defendant is to remain a party and is to defend himself in court. However, his liability is limited by the agreement. In some instances this will call for increased liability on the part of other co-defendants. (2) The agreement is secret. (3) The agreeing defendant guarantees to the plaintiff that he will receive a certain amount, notwithstanding the fact that he may not recover a judgment against the agreeing defendant or that the verdict may be less than that specified in the agreement. *See, e.g., Ward v. Ochoa,* 284 So. 2d 385, 387 (Fla. 1973); Freedman, *The Expected Demise of "Mary Carter": She Never Was Well!* 633 Ins. L.J. 602, 603-04 (October 1975); Note, *The Mary Carter Agreement — Solving the Problems of Collusive Settlements in Joint Tort Actions,* 47 So. Cal. L.R. 1393, 1396-97 (1974); Comment, *Blending Mary Carter's*

*Colors: A Tainted Covenant,* 12 Gonzaga L. Rev. 266, 268-69 (1977); and Annot., 65 A.L.R.3d 602, 605-06 (1975).

On the issue of secrecy, the Florida Supreme Court said in *Ward:*

> Secrecy is the essence of such an arrangement, because the court or jury as trier of the facts, if apprised of this, would likely weigh differently the testimony and conduct of the signing defendant as related to the non-signing defendants. By painting a gruesome testimonial picture of the other defendant's misconduct or, in some cases, by admissions against himself and the other defendants, he could diminish or eliminate his own liability by use of the secret "Mary Carter Agreement." [*Id.* 284 So.2d at 387.]

The A.L.R. annotation points out that an injured plaintiff may be motivated to enter into such an agreement because it will assure a minimum recovery without "unequivocally releas[ing] the agreeing defendant." Comment is then made:

> On the other hand, an agreeing defendant who is clearly culpable might enter such an agreement because it defines the outer perimeters of his liability, usually the limits of his insurance coverage, while his insurer will favor the arrangement since it tends to negate the possibility of eventually being held liable for an amount in excess of policy limits on the basis of a bad-faith failure to settle. [*Id.* at 606.]

Further discussion of such agreements is found in Scoby, *Loan Receipts and Guaranty Agreements,* 10 Forum 1300 (1975); Note, *Are Gallagher Covenants Unethical?: An Analysis Under the Code of Professional Responsibility,* 19 Ariz. L. Rev. 863 (1977); Note, *Settlement Devices With Joint Tortfeasors,* 25 U. Fla. L. Rev. 762 (1973); and Note, *"Mary Carter" Limitation on Liability Agreements Between Adversary Parties: A Painted Lady is Exposed,* 28 U. Miami L. Rev. 988 (1974).

GM insists that such agreements should be declared void as a matter of public policy. The Lahockis counter by saying that this is not a Mary Carter Agreement. We do not find it necessary to determine whether this particular agreement is or is not a Mary Carter Agreement. We note, however, that each of the three basic features we have said are to be found in all such agreements are found here. The settling defendant stayed in the litigation; the agreement was kept secret; and there was a guarantee to the plaintiff of some recovery.

Of the three characteristics found in such agreements, secrecy is the one that has been most frequently condemned. *See, e.g., Daniel v. Penrod Drilling Company,* 393 F. Supp. 1056 (E.D. La. 1975):

> Courts are not merely arenas where games of counsel's skill are played. Even in football we do not tolerate point shaving. It is perhaps because the trial is adversary that each side is expected to give its best, without secret equivocation. Counsel have no duty to seek ultimate truth in a system where the lawyer's duty is primarily to represent his client. But even if the lawyer has no duty to disclose the whole truth, he does have a duty not to deceive the trier of fact, an obligation not to hide the real facts behind a facade. [*Id.* at 1060-61.];

*Mustang Equipment, Inc. v. Welch,* 115 Ariz. 206, 564 P.2d 895, 900 (1977); *Ward v. Ochoa, supra:*

> The search for the truth, in order to give justice to the litigants, is the primary duty of the courts. Secret agreements between plaintiffs and one or more of several multiple defendants can tend to mislead judges and juries, and border on collusion. [*Id.* 284 So. 2d at 387.];

*Gatto v. Walgreen Drug Co.,* 61 Ill. 2d 513, 522, 337 N.E.2d 23 (1975); *Schell v. Albrecht,* 65 Ill. App. 3d 989, 994, 383 N.E.2d 15 (1978); and Freedman, *op. cit.* at 609.

It is sufficient for the purposes of our decision here to inquire as to whether this was a settlement agreement which

by the terms of the pretrial order the parties were bound to disclose, whether it had a prejudicial effect upon GM, and, if it did, what corrective action should be taken.

### a. Was this a settlement agreement?

When there is a law suit against multiple defendants in which one of the defendants agrees to pay as much as $250,000, but not less than $100,000 to the plaintiffs even if a jury finds in favor of that defendant, except in the circumstance where the jury finds *only* another defendant liable, it requires no detailed examination or citation of authority or case law for us to conclude that a settlement is involved. Long ago this Court said in *St. John's College v. Purnell,* 23 Md. 629 (1865):

> The essence of compromise, a mode of adjustment always favored by the law, is the waiver of pre-existing claims and remedies in favor of the right or claim ascertained and fixed by the composition; and it is usually resorted to for the very purpose of substituting in place of a right or claim, doubtful from ignorance or upon other grounds, a new and fixed liability. [*Id.* at 640-41.]

In *Pentz v. Penn. Fire Ins. Co.,* 92 Md. 444, 448, 48 A. 139 (1901), the Court said, "The word settlement, as ordinarily used, may mean a compromise for peace's sake of a claim, the validity of which is denied or it may signify the payment of a claim to the extent to which it is conceded to be due." This was a settlement agreement which should have been disclosed pursuant to the pretrial order.

### b. Was GM prejudiced?

GM argues that prior to the execution of this agreement Contee's primary interest was to obtain a verdict in its favor and its secondary and contingent interest was to have GM share any liability in the event it and Contee were found liable

to the plaintiffs, but that the agreement changed Contee's position as to GM. It says:

> Instead of a contingent interest in establishing GM's responsibility, Contee then had a direct interest in doing so. Instead of a mere third-party claim against GM on which Contee might prevail only if it were, itself, held liable to the plaintiffs, Contee became the holder of a $150,000 stake in the plaintiffs' claim against GM since it would be relieved of its $150,000 promised payment to the plaintiffs should the jury return verdicts only against GM.
>
> Under third-party practice, Contee was to have a full opportunity to prosecute its claim for contribution when the time came to put on its case — whether or not the plaintiffs prevailed against GM. But after the Agreement, Contee could not risk waiting to prosecute its case against GM until after the plaintiffs had concluded their case against both Contee and GM. The Agreement gave Contee a compelling financial incentive to bolster the plaintiffs' case by filling in areas not covered,[2] by reiterating testimony harmful to GM,[3] and by "cross-examining" witnesses who were not adverse.[4] In short, Contee did all in its power to see that the plaintiffs obtained a verdict against GM.

(The footnotes refer to pages in the record extract which do in fact support the allegations of GM.)

The apparent trial atmosphere of this case is illustrated by the comments of the trial judge who did know of the Lahocki-Contee agreement. The Lahockis produced an expert in support of their claim against GM. When this expert was being cross-examined by Contee's attorney the statements by the judge in ruling on objections included:

> Are you proffering that you are cross-examining him, testing his credibility, or are you trying to inject additional evidence?

* * *

In effect you are making him your own witness, are you not?

* * *

The difficulty with the last question is you are asking him something that wasn't testified to on direct, his review of a specific interrogatory which would in effect have the net result of injecting into the testimony something out of that interrogatory — is that already in evidence or is that something —

* * *

Your approach is you are going back over the same evidence that has come out initially.

* * *

But to go back all over the testimony and try to cure a couple of defects to establish a claim, I don't think cross-examination is the time to do that.

* * *

My thinking is that what you are doing at this time is endeavoring to improve your third-party claim.

* * *

If you are just going over it, reemphasizing it, it is repetitious, isn't it? And it would be objectionable for that reason.

* * *

You are just going over the whole testimony. You are presenting in effect his direct.

The record at another point is illuminating:

THE COURT: You are going back over the case, in effect, that he's already testified to.

MR. MACKALL [, Counsel for Contee]: Well, you might as well foreclose my cross-examination.

> THE COURT: You are not cross-examining. You are just having him reemphasize what he's already testified to. If you have some area that he didn't bring out —

> MR. MACKALL: Well, I will try.

At another point:

> THE COURT: I haven't heard anything new in this testimony yet. You have been 30 minutes and you are just going back over everything that he's testified before. I haven't heard anything new.

Thus, GM's assertion that the agreement effected a change in its relationship as a co-defendant with Contee is adequately borne out by the record.

As Judge Hammond observed for this Court in *Chertkof v. Harry C. Weiskittel Co.,* 251 Md. 544, 550, 248 A.2d 373 (1968), *cert. denied,* 394 U.S. 974 (1969), "Courts look with favor upon the compromise or settlement of law suits in the interest of efficient and economical administration of justice and the lessening of friction and acrimony." To like effect see *Sisson v. Baltimore,* 51 Md. 83, 95-96 (1879). The agreement here collided with that policy in two regards. (1) Because GM did not know that a settlement had been effected between the Lahockis and Contee it could not bargain on the same basis as it might have bargained had it known of this settlement. (2) There was an inducement to the Lahockis not to settle with GM, since in that event the sum which they were to receive from Contee was to be reduced by $50,000.

Moreover, the policy of this State is for the trier of fact to have knowledge of the real party in interest as demonstrated by the fact that Maryland Rule 203 a provides, with exceptions not relevant here, "An action shall be prosecuted in the name of the real party in interest . . . ." Rule 203 d says, "Where it appears that the action has not originally been filed in the name of the real party in interest under section a, the court may, upon petition of a defendant, order the real party in interest to be made a party plaintiff." *Accord* Rule 243 pertaining to subrogation.

Embedded in our procedure is the doctrine that a party calling a witness vouches for his credibility. *Patterson v. State,* 275 Md. 563, 570, 342 A.2d 660 (1975); *Rinard v. Nationwide Mut. Ins.,* 269 Md. 1, 6, 304 A.2d 252 (1973); and *Proctor Elec. Co. v. Zink,* 217 Md. 22, 32, 141 A.2d 721 (1958), citing *Murphy v. State,* 120 Md. 229, 87 A. 811 (1913), and 3 Jones, *Evidence Civil Cases* §§ 853 and 854 (4th ed. 1938). There is an indication here that the expert on the issue of the design defect in the manufacture by GM of the van was paid jointly by Lahocki and Contee. Even if the jury were aware of this fact it might well have viewed this testimony in a somewhat different manner had it been aware of the extent of collaboration between the Lahockis and Contee. Judge Lowe cogently observed for the Court of Special Appeals, "If it is not comparable, it is not unlike a codefendant in a criminal case who has exchanged by plea bargain an advantage to himself in return for his testimony. We have held constitutionally that the government must disclose the bargain to the jury to be weighed against his credibility." 41 Md. App. at 609.

Given the above circumstances, we regard it as likely that the non-disclosure of this agreement to the jury had a prejudicial effect upon GM.

c. The corrective measures to be taken.

We do not go so far as to proclaim such an agreement void as against public policy. The public policy is to encourage settlements. We do not believe the agreement here amounts to champerty, one of the factors that led the court in *Lum v. Stinnett,* 87 Nev. 402 488 P.2d 347 (1971), to declare the agreement there void. *See Wheeler v. Harrison,* 94 Md. 147, 158, 50 A. 523 (1901). We do agree with the Nevada court that use by the parties of the "inherent advantages [of the agreement are] inimical to true adversary process." *Lum,* 488 P.2d at 352.

Nearly every court which has considered the matter has recognized that agreements such as that in the case at bar have a potential for skewing the posture of the trial, but they have dealt with the problem in a variety of ways. Such

agreements have been ,voided entirely on broad policy grounds as in *Lum;* for their untoward effect upon settlement as in *Mustang Equipment;* or on the basis of the peculiar facts and circumstances of those cases in *Alder v. Garcia,* 324 F.2d 483 (10th Cir. 1963); *Bolton v. Ziegler,* 111 F. Supp. 516 (N.D. Iowa 1953); *Cullen v. Atchison, T. & S. F. Ry.,* 211 Kan. 368, 507 P.2d 353 (1973); and *Trampe v. Wisconsin Telephone Co.,* 214 Wis. 210, 252 N.W. 675 (1934).

The majority view as embodied in cases such as *Maule Industries v. Rountree, supra; Ward v. Ochoa, supra; Reese v. Chicago, B. & Q. R.R.,* 55 Ill. 2d 356, 303 N.E.2d 382 (1973); *Bristol-Myers Co. v. Gonzales,* 561 S.W.2d 801 (Tex. 1978); and *General Motors Corp. v. Simmons,* 558 S.W.2d 855 (Tex. 1977), is that such agreements are not bad generally, but prejudice is shown warranting a new trial if they have not been disclosed upon proper motion and admitted into evidence. The reason for this is that in judging the credibility of a witness the jury is entitled to know of his interest in the outcome. *Contra: Wyller v. Fairchild Hiller Corporation,* 503 F.2d 506 (9th Cir. 1974); and *Tucson v. Gallagher,* 108 Ariz. 140, 493 P.2d 1197 (1972). There has been a suggestion that in some circumstances it might be wise not to admit into evidence a full, unedited agreement because the parties might insert a number of self-serving declarations into the contract. See, *e.g.,* Note, *The Mary Carter Agreement — Solving the Problems of Collusive Settlements in Joint Tort Actions, supra,* at 1412, and Comment, *Mary Carter Agreements: Unfair and Unnecessary,* 32 S.W.L.J. 779, 795-96 (1978). In this instance, however, there are no self-serving declarations.

The situation in the case at bar is materially different from that represented by *Brooks v. Daley,* 242 Md. 185, 218 A.2d 184 (1966), discussed by the Court of Special Appeals and relied upon by the Lahockis. There in a chain-type automobile accident Daley's vehicle was struck from behind by one operated by Mrs. Schaaf. It in turn was struck from behind by a vehicle operated by Brooks, causing the Schaaf vehicle to strike the Daley car a second time. Daley filed two separate actions, one against Schaaf and one against Brooks. The cases were consolidated for trial. On the morning of trial,

settlement was effected between Schaaf and Daley, an order of satisfaction was filed, and the cause was dismissed. In the other case Mrs. Schaaf had been impleaded as a third-party defendant. The trial court refused to allow any evidence of the settlement between Daley and Schaaf to be presented to the jury. The court pointed out that the release was governed by the Uniform Contribution Among Tort-Feasors Act, that if the jury had found Mrs. Schaaf jointly liable with Brooks, then Brooks would have been entitled to a reduction in the amount of the judgment owed Daley equal to the amount of the consideration paid by Schaaf to purchase her release, but if she were found to be not negligent, then Brooks was liable for the entire judgment, not being entitled to any reduction in the verdict. In this context Judge Barnes said for the Court:

> The trial court was correct in ruling at the commencement of the trial that the jury should not have been informed of the settlement. The method of letting the jury apply prior payment in reduction of the verdict against a joint tort-feasor who had not settled with the plaintiff, is far less satisfactory than that of having the court make the necessary reduction at the conclusion of the trial.
>
> The Commissioners' Note to § 4 of the Uniform Contribution Among Tortfeasors Act (§ 19 of the Maryland Act) states that the method of having the trial court reduce the verdict is more desirable than that of delegating this function to a jury. A jury should not be informed of a settlement since that fact would only tend to mislead them in their deliberations in arriving at a just verdict, and could be construed incorrectly as an admission of liability on the part of the settling third-party defendant. *Martello v. Hawley,* 300 F.2d 721 (D.C. Cir. 1962); *Walton v. Tull,* 234 Ark. 882, 356 S.W.2d 20 (1962). [*Id.* at 193.]

In the context of that case there was no room for misunderstanding. Moreover, there was not an alignment

between a defendant and a plaintiff. In short, there was no room for mischief. Here there was.

We hold that the procedure which should have been followed is to inform the jury precisely as to exactly what the circumstances are between the parties. This may be done either by the presentation of the agreement itself in a case such as this where there are no self-serving declarations or by a statement as to the terms of the settlement. A new trial of the claim of the Lahockis against GM is mandated at which time this shall be accomplished.

## II

### Lahocki v. Contee

The accident in question took place on August 28, 1975, at approximately 8:00 p.m. The van in which Lahocki was a passenger was eastbound on University Boulevard. University Boulevard at that point is a divided highway. Contee was in the process of constructing an extension of the eastbound left turn lane of University Boulevard into Metzerott Road pursuant to a contract with the State Highway Administration. The driver of the van and the driver of a vehicle immediately behind him described lighting conditions as "dusk," a term which was defined by the van driver as "[g]etting dark." He said he had turned on his parking lights.

Contee impinged upon the surface of the highway by the placement of barricades consisting of 10″ timbers, 10 feet long, each with two 4″ x 4″ uprights and two 1″ x 6″ horizontal members (much like a railroad tie with a rail fence attached) and placed end to end along the roadway. The driver of the van said that as it went over the crest of a hill he observed the barricades one or two feet out into the road. He attempted to move into the right lane but there was another vehicle near the center line. As he put it, he "had a split-second decision to make whether to hit this old lady in the blue car or hit the barricades." He "side-swiped the barricade," causing the damage here at issue.

The investigating officer arrived at the scene at 8:02 p.m. He said that at 8:01 while on routine patrol he heard an off duty policeman advise on the radio of this particular accident. On the subject of lighting conditions, he said he was using his headlights when he arrived on the scene. He described the conditions, "It was dusk. It was halfway between full daylight and complete darkness." He observed a number of untouched barricades east of the accident scene. Amber warning light packages were attached to the top of each. At one point in his testimony he said some of these lights were working. He twice testified, however, that these lights were not functioning at all. The off duty officer to whom we have referred said he observed barricades with lights mounted on top of them, but none of the lights were working.

One of the officers testified to having proceeded through the area the day before the accident with his emergency light flashing. He did not "recall exactly how much room [he] had on either side, but it was enough to frighten [him] when [he] was going through there, because [he] was worried about whether [he] was going to hit a vehicle or barricade."

Contee's contract required traffic control devices, including signs, warning lights and barricades, to comply with the provisions of the Manual of Uniform Traffic Control Devices for Streets and Highways.

At the conclusion of all the testimony the trial court granted Contee's motion for a directed verdict. The Court of Special Appeals said, "The trial judge was correct in directing a verdict for Contee, if not for the reasons he assigned, then for lack of evidence of damages attributable to Contee." *Id.* 41 Md. App. at 612-13.

The trial judge said in part in granting the directed verdict:

I come then to the final issue, and what I have considered as controlling in this case, and that is overriding the other issues, but consistent with some of those which I have discussed. That is the Stitzel Doctrine [(referring to *Stitzel v. Kurz,* 18 Md. App. 525, 308 A.2d 430 (1973))] that is expressed in other cases, *Strasburger v. Vogel,* [103 Md. 85, 63 A. 202

(1906),] . . . and the case of *Richards v. Huntt,* [255 Md. 255, 257 A.2d 412 (1969),] and also the case of *Langville v. Glen Burnie Lines* [, 233 Md. 181, 195 A.2d 717 (1963)]. That is in effect, that where there is evidence in a case of an independent cause of an accident or incident for which a defendant, a single defendant would not be responsible, that the plaintiff has the burden of ruling out that cause as a cause of the incident involved in order for a jury to be able to determine whether or not the negligence of the defendant in the case being considered was the proximate cause of the injury. Because if there was an independent cause for which that defendant would have no responsibility, then unless that is ruled out of the case there could be no possible determination of proximate cause by a jury absent some speculation.

It is stated a little more succinctly than I have in this *Strasburger v. Vogel* case where the Court says, "But when the plaintiff himself shows that the injury complained of must have resulted *either* from the negligence of the defendant *or* from an independent cause," for the existence of which the owner can show affirmatively that he himself has not been guilty of negligence, that a positive essential of the case of the plaintiff is that the plaintiff shall allege and prove that the defendant was guilty, the burden is on the plaintiff to rule out that independent cause in order to be able to have a jury consider whether or not the defendant in the case in issue is negligent, and whether that negligence was the proximate cause of the injury. [Emphasis in *Strasburger.*]

Contee argues:

Lahocki's only injury — a broken back — was a "single indivisible injury" and as claimed by Lahocki and demonstrated conclusively by the evidence, this single injury was caused solely by defendant General Motors Corp. ("GM") in manufacturing a

defective vehicle, the GM van in which Lahocki was riding. Had the roof assembly of the GM van not separated from the van in the accident, Mr. Lahocki would have suffered no injuries. Accordingly, upon the evidence and by Lahocki's own claim, Contee was in no way responsible for Lahocki's injury.

It also argues that Contee cannot be held liable for the acts for which it was charged with negligence because they were commanded by a State agency and Contee had no discretion in the matter; that the undisputed physical facts establish that the roadway between the construction barricade and the center line between the two eastbound lanes where the accident occurred provided adequate clearance for the driver of the van to pass safely through the construction barricade area and that hence, as a matter of law, there was no liability on the part of Contee; and that Lahocki's own testimony shows that his injuries resulted from a cause for which Contee was not responsible, referring to the presence of the blue car in the righthand lane.

Under our cases if the Lahockis presented any legally sufficient evidence tending to show negligence on the part of Contee which was a proximate cause of his injuries, the trial court erred in directing a verdict against them. *Vann v. Willie,* 284 Md. 182, 185, 395 A.2d 492 (1978), and cases there cited. In considering a motion for a directed verdict the trial court assumes the truth of all credible evidence on the issue and of all inferences fairly deducible therefrom. It then considers them in the light most favorable to the party against whom the motion is made. *Impala Platinum v. Impala Sales,* 283 Md. 296, 328, 389 A.2d 887 (1978), and cases there cited. If there is any legally relevant and competent evidence, however slight, from which a rational mind could infer a fact in issue, then a trial court would be invading the province of the jury by directing a verdict. In such circumstances, the case should be submitted to the jury and a motion for a directed verdict denied. *Id.*

The reliance of the trial court and of Contee on such cases as *Strasburger v. Vogel,* 103 Md. 85, 63 A. 202 (1906);

*Richards v. Huntt,* 255 Md. 255, 257 A.2d 412 (1969); *Langville v. Glen Burnie Lines,* 233 Md. 181, 195 A.2d 717 (1963); and *Stitzel v. Kurz,* 18 Md. App. 525, 308 A.2d 430 (1973), is misplaced.

In *Strasburger* a child plaintiff was injured by bricks which fell from a chimney of the defendant's building. The chimney apparently was in good order. The plaintiff invoked the doctrine of res ipsa loquitur. He adduced evidence, however, that there were men at the top of the building leaning on the bricks at the time of the incident. The Court said that by having introduced a possible independent cause of the accident the plaintiff had proved too much, which precluded the application of res ipsa. It was in this context that Chief Judge McSherry said for the Court:

> [W]hen the plaintiff himself shows that the injury complained of must have resulted *either* from the negligence of the defendant *or* from an independent cause for the existence of which the defendant is in no way responsible, he cannot be permitted to recover until he excludes the independent cause as the efficient and proximate cause of the injury . . . . [*Id.* at 91-92 (emphasis in original).]

*Stitzel* involved a suit against the driver of a vehicle and against Baltimore County. Plaintiff's decedent had been killed while a passenger in a vehicle driven by Kurz. Evidence of Kurz' negligence was produced at trial. However, there was also evidence produced that the accident occurred when Kurz became confused by virtue of a highway sign which incorrectly showed a curve to the right when in fact there was "a fairly sharp turn to the left at that point." The Court of Special Appeals said that "the evidence . . . permitted an inference that Kurz did see an erroneous directional sign, though only subconsciously, that he was misled and confused by it, and that the sign was a proximate cause of the events which followed." *Id.* at 533. It pointed out that the jury would have been free to reject this inference and to conclude that the accident was caused solely by his negligence. It held "that the fact that there was evidence tending to show negligence

on the part of Baltimore County would not, under the 'either-or' rule, require a directed verdict for Kurz." *Id.* at 536. Hence, the trial court erred in granting the motion of Kurz for judgment n.o.v.

In *Richards,* also relied upon by the trial court, we discussed *Strasburger, Langville,* and *Short v. Wells,* 249 Md. 491, 240 A.2d 224 (1968). Both *Short* and *Langville* were discussed by Judge Powers for the Court of Special Appeals in *Stitzel.* We held in *Richards* that where there was a conflict in the direct evidence the matter was one for the jury. We quoted *Short* to the effect that the trial judge "should have submitted the evidence to the jury to determine the credibility of the witnesses and the weight to be given the evidence to determine whether or not the driver of the automobile had violated a rule of the road." In *Short,* the trial court had relied on *Langville* as a basis for directing a verdict against the plaintiff because, having used the deposition of one passenger whose testimony was sufficient to take the case to the jury, she called another passenger whose testimony was contradictory and indicated non-negligence. Judge Horney said for this Court, "In so doing, the court, perhaps because it could not see the forest for the trees, overlooked the fact that the conflict was not in the competing inferences drawable from the circumstantial evidence but in the direct evidence. For that reason, the court should have submitted the evidence to the jury to determine the credibility of the witnesses and the weight to be given the evidence to determine whether or not the driver of the automobile had violated a rule of the road." *Id.* at 497.

Contee would have us hold that because the injuries sustained by Lahocki came as a result of being thrown out of the van after the roof assembly separated, this relieves Contee of any obligation. This argument fails to recognize that there may be more than one proximate cause of injuries. *Karns v. Liquid Carbonic Corp.,* 275 Md. 1, 20, 338 A.2d 251 (1975), and cases there cited. Contee relies on *Kyte v. McMillion,* 256 Md. 85, 259 A.2d 532 (1969). There an individual was hospitalized as a result of being injured while a passenger in McMillion's car. Unfortunately, the wrong

type of blood was administered to her at the hospital. Her claim against the hospital was settled. McMillion then attempted to interpose the release to the hospital as a bar to the claim against McMillion. We held under the facts and circumstances of that case that McMillion was not a joint tortfeasor with the physician whose negligence aggravated the original injury and that action against the physician for damages resulting from his wrong was not an election of remedies barring subsequent recovery against the original wrongdoer for damages resulting from the original wrong. We pointed out that the release was limited to damages for injuries as a result of and by reason of treatment rendered to the passenger "specifically including but not limited to a transfusion of blood," and that the hospital was in no way responsible for the passenger's broken bones.

The notion of a superseding act which would break the causal connection between a defendant's negligence and a plaintiff's injury was fully discussed by this Court in *State v. Hecht Company,* 165 Md. 415, 169 A. 311 (1933). There a child died in a fall down Hecht's elevator shaft. Hecht had not observed the statutory safeguards relating to elevators, which gave rise to a presumption of negligence. It argued that the accident was actually caused by another who had negligently left open the elevator door. Judge Adkins said for the Court:

> The connection between a defendant's negligence and the plaintiff's injury may be broken by an intervening cause. But in order to excuse the defendant, this intervening cause must be either a superseding or a responsible cause. It is a superseding cause, whether intelligent or not, if it so entirely supersedes the operation of the defendant's negligence that it alone, without his negligence contributing thereto in the slightest degree, produces the injury. It is a responsible one, if it is the culpable act of a human being, who is legally responsible for such act. The defendant's negligence is not deemed the proximate cause of the injury, when the connection is thus actually broken

by a responsible intervening cause. But the connection is not actually broken, if the intervening event is one which might, in the natural and ordinary course of things, be anticipated as not entirely improbable, and the defendant's negligence is an essential link in the chain of causation. Of course, the definition of a superseding cause implies that the defendant's negligence cannot be the cause of the injury.

If the negligent acts of two or more persons, all being culpable and responsible in law for their acts, do not concur in point of time, and the negligence of one only exposes the injured person to risk of injury in case the other should also be negligent, the liability of the person first in fault will depend upon the question whether the negligent act of the other was one which a man of ordinary experience and sagacity, acquainted with all the circumstances, could reasonably anticipate or not. If such a person could have anticipated that the intervening act of negligence might, in a natural and ordinary sequence, follow the original act of negligence, the person first in fault is not released from liability by reason of the intervening negligence of another. [Citing cases and authorities. *Id.* at 421-22.]

W. Prosser, *Handbook of Law of Torts* § 44 (4th ed. 1971) is instructive on the subject:

Suppose that the defendant is negligent because his conduct threatens a result of a particular kind which will injure the plaintiff, and an intervening cause which could not be anticipated changes the situation, but ultimately produces the same result? The problem is well illustrated by a well-known federal case. [*Johnson v. Kosmos Portland Cement Co.,* 64 F.2d 193 (6th Cir. 1933).] The defendant failed to clean the residue out of an oil barge, tied to a dock, leaving it full of explosive gas. This was of course negligence, since fire or explosion, resulting in harm

to any person in the vicinity, was to be anticipated from any one of several possible sources. A bolt of lightning struck the barge, exploded the gas, and injured workmen on the premises. The defendant was held liable. If it be assumed that the lightning was an unforeseeable intervening cause, still the result itself was to be anticipated, and the risk of it imposed upon the defendant the original duty to use proper care.

In such a case, the result is within the scope of the defendant's negligence. His obligation to the plaintiff was to protect him against the risk of such an accident. It is only a slight extension of his responsibility to hold him liable when the danger he has created is realized through external factors which could not be anticipated. An instinctive feeling of justice leads to the conclusion that the defendant is morally responsible in such a case, and that the loss should fall upon him rather than upon the innocent plaintiff. [*Id.* at 286.]

We have here no attempted application of the doctrine of res ipsa loquitur as in *Strasburger* where the plaintiff showed that the injury complained of might have resulted *either* from the negligence of the defendant *or* from an independent cause for the existence of which the defendant was not responsible. We do not have the situation which existed in *Kyte* where there was a possible aggravation of the original injury at a later time and a release had been executed to the party responsible for that aggravation. We have a case clearly covered by *Hecht* and the discussion in Prosser. But for the alleged negligence of Contee the design defect would not have been manifested and there would have been no injury. What Judge Adkins said for the Court in *Hecht Company* is clearly applicable here. It will be recalled that he said for the Court, "It is a superseding cause, whether intelligent or not, if it so entirely supersedes the operation of the defendant's negligence that it alone, without his negligence contributing thereto in the slightest degree, produces the injury." He then went on to say for the Court, "[T]he connection is not actually

broken, if the intervening event is one which might, in the natural and ordinary course of things, be anticipated as not entirely improbable, and the defendant's negligence is an essential link in the chain of causation." *Id.* 165 Md. at 421. Accordingly, the doctrine of superseding cause is not available here in support of the motion for a directed verdict in favor of Contee.

The remaining grounds urged by Contee for the grant of a directed verdict in its favor need detain us no longer than they detained the trial judge. There was a conflict of evidence as to whether all that Contee did was in accordance with that specified by the State agency. Contee says it had fully conformed, but there was testimony that all of the required lights were not lit. Thus, a jury question was generated.

It likewise was for the jury to determine whether the roadway provided sufficient clearance for a motor vehicle operated in accordance with the speed limits established at that point to pass through with safety. Similarly, it was a jury question as to whether the blue car in the right hand lane or Contee's negligence was responsible for the accident.

> *Judgment of the Court of Special Appeals reversed and case remanded to that court for the passage of an order reversing the judgment of the Circuit Court for Prince George's County and remanding the case to that court for trial consistent with this opinion; costs to abide the final result.*